Joanne **SIEGEL** and Laura Siegel **Larson, Plaintiffs,**

v.

**WARNER BROS. ENTERTAINMENT INC.; Time Warner Inc.; and DC Comics, Defendants.**

**Case No. CV–04–8400–SGL (RZx).**

United States District Court, C.D. California, Eastern Division.

Aug. 12, 2009.

See also, 2009 WL 2014164.

Jeffrey Bruce Linden, Keith Gregory Adams, Marc Toberoff, Nicholas Calvin Williamson, Rafael Gomez–Cabrera, Marc Toberoff Law Offices, Los Angeles, CA, for Plaintiffs.

Anjani Mandavia, David L. Burg, Michael Bergman, Adam Beriah Hagen, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA, James D. Weinberger, Roger L. Zissu, Fross Zelnick Lehrman & Zissu, Jonathan Zavin, Loeb & Loeb LLP, New York, NY, Patrick T. Perkins, Perkins Law Offices, Cold Spring, NY, for Defendants.

## ORDER RESOLVING ADDITIONAL ISSUES

STEPHEN G. LARSON, District Judge.

The 1976 Copyright Act contains many intricate formalities that an author (or his or her heirs) must navigate to successfully terminate the grant to the copyright in an original work of authorship, but perhaps none is more fundamental an impediment than the one excluding from the reach of termination the copyright "in a work made for hire." 17 U.S.C. § 304(c); *see* 1 MELVILLE B. NIMMER, NIMMER ON COPYRIGHT § 5.03[A] at 5–12 (2008) (commenting that the exclusion "relating to termination of transfers is probably the most important feature of the work for hire doctrine with respect to works created at present"); 3 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 7:42 (2008) (labeling as a "significant exclusion" to the right to terminate the grant in "work-for-hire creations"). The complexity of the 1976 Act's termination procedures stems as much from the fact that those provisions intersect with and must be construed in light of the body of copyright law that existed at the time the works were created (here, the 1909 Copyright Act) as from the intricacies set forth in the 1976 Act itself.

This is particularly true when applying the "work made for hire" bar to works created under the auspices of the 1909 Act, as the law developed by the courts under that Act was oftentimes confused and not well-delineated, with its dimension continuing to evolve long after the effective date

of the 1976 Act. *See Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,* 815 F.2d 323, 325 (5th Cir.1987) (commenting that the term "work for hire" was undefined in statute, and that a "substantial body of cases developed as courts worked out the definition").

Having previously addressed the iconic superhero Superman's first appearance in *Action Comics* No. 1 in its earlier decision, the Court now considers the myriad relationships and contractual arrangements surrounding the published works of Superman by his creators Jerome Siegel and Joseph Shuster for the years 1938 to 1943. The task of disentangling these relationships and agreements, and giving legal meaning to them, lies at the heart of this case.

## I. FACTUAL BACKGROUND

When the Court last left Superman, the copyright in the earliest published version of the character, as depicted in the comic book *Action Comics* No. 1, had been reunited with the heirs of one of his creators, Jerome Siegel. *See Siegel v. Warner Bros. Entertainment Inc.,* 542 F.Supp.2d 1098, 1145 (C.D.Cal.2008). One might have thought that with the extensive discussion of Superman's creation and development therein, little more would be left to be said about Superman's first years in print; as the Court has since learned, there is more to the story.

Like the arc of a comic book serial, there has been an unfolding of evidence regarding the creation and subsequent publication of Superman. The parties have presented to the Court previously undisclosed evidence surrounding the back story to Superman's creation before 1938, the character's publication for the years 1938 to 1943 in comic books published by Detective Comics after *Action Comics* No. 1, and in the syndication of daily newspaper comic strips through the McClure Newspaper Syndicate.

### A. Pre–1938 Years: Superman's Initial Creation and Development

As recounted in the Court's earlier Orders, the development of Superman evolved, with the character being reworked by Siegel and Shuster over a period of years. However, missing from that account and now disclosed is the existence of another collaborator.

The story picks up with Siegel dramatically rescuing from the flames the cover art work from the pair's initial version of the Superman character in heroic form (as a hulking strong man, sans super-human powers or alien origin, in the fashion of Flash Gordon) after Shuster grew despondent when the publisher to the comic book *Detective Dan* rescinded its offer to publish the material. *See Siegel,* 542 F.Supp.2d at 1103. This led to a split of sorts with Siegel, with Shuster apparently deciding he was no longer interested in continuing to illustrate Superman, and Siegel apparently concerned that the character was going nowhere under Shuster's artistic direction. As Siegel later recounted, after the debacle with *Detective Dan,* Shuster became "very discouraged" and decided that he "did not want to work on Superman anymore." (Decl. Marc Toberoff, Ex. F at 45). Undeterred, Siegel sought out other artists to illustrate his scripts as he continued to flesh out the Superman character. *See Siegel,* 542 F.Supp.2d at 1103 ("Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip").

Notably, Siegel approached illustrator Russell Keaton, who at that time was providing the art work for the Buck Rogers Sunday newspaper strips. For a few months spanning the summer and fall of

1934, the pair exchanged correspondence and scripts for Superman. This activity culminated with Siegel and Keaton producing a week's worth of newspaper comic strips (or nine horizontal strips, each containing four panels, with dialogue and illustrations), and Siegel drafting for Keaton's consideration three scripts (for which no illustrations were ever created) for Superman that, taken together, demonstrated the evolving nature of the character.

The story portrayed in the scripts and the week's worth of illustrated material was devoted exclusively to Superman's upbringing as a child by a couple known only as Sam and Molly Kent, and included the first inklings of a science fiction aspect to the character, albeit with a much different take on Superman's now well-familiar origins.

In this earlier version, Siegel conceived of Superman as having been sent as an infant back in time, to then-present day America (circa 1935), in a time machine created by "the last man on Earth" before the planet's destruction. The story is also notable as it contained the first expression of Superman's now familiar super-human powers: That he had a "physical structure millions of years advanced from" those living in 1935, leading him to possess "colossal strength," the ability to "leap over a ten story building," "run[ ] as fast as an express train," and stated that "nothing less than a bursting shell could penetrate his tough skin." Upon his arrival, Superman spoke a language that his adoptive parents did not understand, and the secret of his origins was tied to a cryptic mystery note accompanying him in the time machine. When, as an adult, Clark Kent was presented with the mystery note, he could not understand the words written on it. Both the illustrated strips and the scripts

contain the by-line crediting its authorship to "Jerome Siegel and Russell Keaton." (Decl. Marc Toberoff, Exs. C, D & E).

Keaton eventually chose not to take a chance on someone with such little experience writing comics; by sometime in the first half of 1935, Siegel and Shuster resumed their creative partnership and were again working together on Superman, with the pair poised at the tipping point that would lead them to create the version of the character that would transform the comic book industry. In fact, it was shortly thereafter that Siegel would have his breakthrough moment, conceiving of the now-familiar Superman story on a "hot summer night."[1] It was then that Siegel combined his now developed Superman character as a mythic superbeing capable of fantastic feats with a new pseudo-scientific explanation for those feats to make them more plausible—the character's extra terrestrial origin. Shuster then went about creating a graphical representation of Siegel's character, replete with costume and distinctive physical features:

> The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication. Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers. The art work for the first week's worth of "daily comic strips was completely inked" and thus ready for publication. The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead

---

1. In its March 26, 2008, Order, the Court describes this "hot summer night" moment as occurring in 1934; however, the undisputed evidence now points to an undefined date in the summer of 1935.

consisting of no more than black-and-white pencil drawings.

*Siegel,* 542 F.Supp.2d at 1105. Much of this four weeks' worth of material was later re-cut and re-pasted into a comic book format and published in the first installment of Detective Comics' comic book magazine *Action Comics.* Not widely known is the amount of material, beyond that published, the pair had created during these formative years, outside the watchful eye of any publisher.

To begin, not *all* of the four weeks of pre-existing Superman material created by Siegel and Shuster found its way into print in *Action Comics* No. 1. During the editing process, Detective Comics decided to exclude the first weeks' worth of material in order to accommodate space for other features in the comic book. As later explained by noted comic artist/writer/historian James Steranko in his 1989 forward to DC Comics publication of *Superman Archives, Volume 1:*

> McClure Syndicate agent M.C. Gaines, an early comics pioneer, just happened to have the Siegel and Shuster submission on his desk when president Harry Donenfeld [of Detective Comics] phoned, inquiring about original material to fill a new magazine he was assembling.... Donenfeld recognized the material's appeal and ordered the newspaper strip repasted into comic-book format, *with the first week eliminated to accommodate available space in the magazine,* which was christened **Action Comics**.... The opening tale was reprinted *in its entirety* in **Superman** 1....

(emphasis added).

Indeed, if one compares the material published in *Superman* No. 1 with that in *Action Comics* No. 1, the two mirror one another in every respect except that *Superman* No. 1 contains an additional six pages (the first six pages in the comic) filling in more details about Superman's formative years as well as providing the prologue to the story told in *Action Comics* No. 1 (*see* Addendum A for the first six pages of *Superman* No. 1). Included in the famous first edition re-publication of *Superman* No. 1 is a forward by Siegel himself, which gives the following description of the origins and time of creation for these first six pages of material:

> M.C. Gaines became involved in this enterprise[, the publication of *Superman* No. 1]. Readers may be especially interested in the letter he wrote to me on March 27, 1939 on Detective Comics, Inc. stationary: "With further reference to the SUPERMAN book ... we have decided ... that for the first six pages of the SUPERMAN book that we would like you to take the first page of SUPERMAN, which appeared in ACTION COMICS # 1, and by elaborating on this one page, using different ideas than those contained on this page, work up *two* introductory pages, the last panel of this second page to consist of the panel marked 'X' on the enclosed sheet. On these two pages, you will of course leave out the scientific explanation of Clark Kent's amazing strength, as we want a separate page on that item to use further back in the book with the heading as follows: 'Scientific Explanation of Superman's Amazing Strength', in which you will incorporate five or six various explanations, which we discussed while you were here in New York several days ago.

(Decl. Marc Toberoff, Ex. GG).

Thus, the first two pages in *Superman* No. 1 was composed of material created by Siegel and Shuster in 1939 when the comic book was published, but the following four pages in the comic (pages three through six) represent the first week of Superman material the pair had crafted in 1935.

Beyond this first four weeks of material (containing Siegel's dialogue and Shuster's

illustrations) that was later re-cut and re-pasted in comic book format, Siegel also had written Superman material to which Shuster provided no illustrations.

For example, Siegel wrote a paragraph previewing future Superman exploits which was contained at the end of a "nine-page synopsis of the storyline appearing in the three weeks of penciled daily Super-man newspaper comic strips." 542 F.Supp.2d at 1105. The paragraph Siegel wrote previewing future Superman ex-ploits has now been produced in this case:

> This ends the first month's release and yet the potentialities of the charac-ter, SUPERMAN, has barely been scratched. He's headed for the most exciting and yet humorous adventures this world has even seen. He will win a war single-handed, battle an airplane with his bare hands, swim several hun-dred miles and think nothing of it, etc. He's *different* and sure to become the idol of young and old. He'll participate in sports and astound the nation; he'll single-handed rescue a town from a flood through his super-strength. Un-like most adventure strips the scene of the story will not be laid in some fantas-tic, unknown jungle or planet or country, but will be all the more astounding for having its locale on familiar streets. SUPERMAN will operate against a background of America's most well-known cities, buildings, and pleasure-spots.

(Decl. Marc Toberoff, Ex. A at 12 (empha-sis in original)).

These broad outlines later found expres-sion in the plot of *Action Comics* No. 2, which involved Superman single-handedly averting a war brewing in the fictional country of San Monte that had been insti-gated by a corporate war profiteer. In that comic book, there is a series of panels revealing Superman battling a fighter plane in mid-air with his bare hands, and there is also a series of panels depicting Superman swimming a great distance in the ocean. *Action Comics* No. 4 similarly gives concrete expression to the idea pitched in Siegel's paragraph, telling the story of Superman interceding in a college football game and using his superpowers on the field to astound the crowd. Finally, in *Action Comics* No. 5, Superman is shown saving a town from a flood after a huge dam breaks.

Moreover, even with the renewed part-nership with Shuster, Siegel still looked to and would lift material he had created while corresponding with Keaton, and use it for publications of his newly conceived Superman character. Thus, in November, 1934, Siegel sent to Keaton, a nine-page "synopsis of what will occur during the next two months" to convince a potential publisher to bring the extant version of Superman to print. The synopsis submit-ted by Siegel is of the college football story alluded to a year later in Siegel's "future exploits" paragraph and tracks almost pre-cisely the storyline, both the dialogue and the action direction, that was later publish-ed by Detective Comics in *Action Comics* No. 4.[2] The following example, comparing

2. Plaintiffs also assert that there are addition-al pre–1938 Superman material, in the form of scripts, or synopses for daily newspaper strips, that were created. (Pls.' Opp. at 6 ("scripts (continuity) for 15 Superman daily comic strips (created by Siegel c. 1934) and a 9 page synopsis covering 2 months of daily (at 6 days per week) comic strips of Superman (created by Siegel c. 1934)")). This reference to additional newspaper comic strip material is misleading. The material in question is nothing more than a reference to the newspa-per strips that were later repackaged and published in *Action Comics* No. 1. (*See* Decl. Marc Toberoff, Ex. B ("The drawn daily strips of Superman, herein described, were later cut up, pasted onto pages, and reproduced to-gether with the art of daily strip week one and two in ACTION COMICS No. 1, June, 1938

Siegel's 1934 script with a portion of the published material found in *Action Comics* No. 4, is typical of this near seamless interweaving between these two items. The narrative from Siegel's script is followed by the embodiment thereof in *Action Comics* No. 4:

### Script (page 6)

The coach says: "This is going to be good! The sap is running for a goal, with everyone on the field trying to stop him. There goes Martin for him. Watch Burke come down faster than a window-shade!"

Martin is the first to reach SUPERMAN. As he dives for a tackle he says: "This is for poking into my locker!" SUPERMAN's outhrust arm connects with Martin's face, thrusting off the tackler. "And this," says SUPERMAN, "is for busting me on the jaw!"

Three more players close in on SUPERMAN, from all sides. The coach says to his assistant: "He'll have to be a superman to get by them." SUPERMAN leaps to the shoulder of one of the three oncoming players, and springs on over the other two. The coach's assistant replies: "There's your superman!" SUPERMAN is already half-way down the field. The coach's assistant says: "I believe he's going to make it!" To which Coach Oliver replies: "Just fool's luck so far. Wait until he meets our 'unbeatables'—Stevens, Burns, and Dennis." The entire remaining team piles onto SUPERMAN. The coach yells: "They've got him!"

### *Action Comics* No. 4 (page 8):

issue"); Ex. X at 176 ("In addition, I prepared a synopsis of the story continuity appearing in the three weeks of penciled daily strips. Because we did not want to risk the loss of all the art work we had done, either through the mails or a failure to return it, the synopsis was sent to prospective out-of-town newspaper syndicates and publishers, in lieu of the three weeks of penciled strips, together with the first week of inked strips")). Plaintiffs have not come forward with evidence to refute the fair inference of the evidence that is of record, that the "synopsis" mentioned is nothing more than what was later re-cut and re-pasted in *Action Comics* No. 1.

## B. *Superman's Publication in Comic Books and Newspaper Strips*

Siegel and Shuster's well-traveled Superman concept was eventually published by Detective Comics in the premiere issue of its comic book magazine *Action Comics* in April, 1938, becoming an almost instant success whose popularity endures to this day and whose depiction has been transferred to various media formats. It is in this transfer to different formats that yet another portion of the untold history of Superman's first years in print takes shape.

Shortly before the publication of *Action Comics* No. 1, Siegel and Shuster signed a grant of their rights in the copyright to the Superman material contained therein to Detective Comics. This assignment was executed on March 1, 1938, giving to Detective Comics "such work and strip, all good will attached thereto and exclusive right[s] to the use of the characters and story, continuity and title of strip contained therein . . . to have and hold forever," in exchange for $130. In the grant, Siegel and Shuster further agreed that they would "not employ said characters or said story in any other strips or sell any like strip or story containing the same characters by their names . . . without obtaining [Detective Comics'] written consent therefore."

Superman's appearance in *Action Comics* No. 1 was followed by subsequent installments, "published at regular intervals, each succeeding issue having a SUPER-

MAN comic strip prepared by [Siegel and Shuster], who continue[d] to be paid by DETECTIVE COMICS, INC. at the agreed rate of $10 per page." (April 20, 2007, Decl. Bergman, Ex. S at 282 (Westchester referee's Finding of Fact No. 36)).[3] Thus, *Action Comics* No. 2 was published on May 25, 1938; *Action Comics* No. 3 was published on June 25, 1938; *Action Comics* No. 4 was published on July 25, 1938; *Action Comics* No. 5 was published on August 25, 1938; and *Action Comics* No. 6 was published on September 26, 1938.

It is apparent from the undisputed evidence that publication of Superman as a continuing feature in *Action Comics* was part of a pre-arranged, implicit understanding between the artists and Detective Comics. For instance, before Superman was accepted for publication in the first issue of *Action Comics*, Detective Comics' editor, in a letter dated January 10, 1938, voiced concerns to Siegel about Shuster's ability to handle a continuing "feature" given his preexisting commitments to doing the art work for other regularly appearing comics for the publisher. (Decl. Michael Bergman, Ex. A ("With all the work Joe is doing now ... could it be possible for him to still turn out 13 pages of this new feature? ... if it were humanly possible I'd like to have him turn out this 'Superman' for the new magazine.... It strikes me that adding another 13 pages to his already filled schedule is loading him up to the neck. Please let me know *immediately* whether or not he can do this extra feature" (emphasis in original))).

Similarly, correspondence from another Detective Comics' editor to the pair, *shortly before* Superman's initial appearance in *Action Comics* No. 1, also suggested that the Superman comic was envisioned by the publisher to be a regular feature in its *Action Comics* comic book for which the pair would provide continuing material. On April 8, 1938, Detective Comics sent a check in payment for their "July material," and enclosed was a letter to Siegel remarking that the publisher had "loaded [them] up with 43 pages a month" in material to produce, and expressing concern with the pair's ability to handle such a monumental task, but also reminding the pair that their "chances of ... making more money is bound up with the success of the magazine." (Decl. Michael Bergman, Ex. B).

Superman's acceptance for publication in comic book format apparently rekindled Siegel's interest in seeing his character syndicated in daily newspaper strips. As later explained by Shuster during the bench trial in the 1947 Westchester litigation, even with Superman's publication in *Action Comics* No. 1, he and Siegel still "wanted to see Superman in the newspapers, not in the magazines." (Decl. Marc Toberoff, Ex. N at 118). Their motive was an economic one: At this time, "black-and-white newspaper comic strips ... were" not only "the most popular medium for comics," but were also potentially the most lucrative. *Siegel*, 542 F.Supp.2d at 1103. Toward that end, Siegel, initially without either the approval of or notice to Detective Comics, began shopping around the now accepted, but as yet unpublished, Superman character to various newspaper publishers seeking syndication in or around March or early April, 1938. That Siegel did not first approach Detective Comics about syndicating Superman in newspapers was understandable given that, in Shuster's words, Detective Comics "wasn't running a newspaper." (Decl. Marc Toberoff, Ex. N at 118). As Siegel

---

**3.** The Court previously held that the referee's factual findings are binding in this litigation.

*Siegel,* 496 F.Supp.2d at 1136.

later explained in an unpublished memoir titled "Creation of a Superhero":

I continued attempting to break into newspaper syndication. On April 8, 1938, an employee in the Business Department of the McClure Newspaper Syndicate wrote to me asking if I would be agreeable to working out two weeks of "Superman" newspaper strips at no obligation to them: "You should get a letter from the publisher of these magazines before we can get down to brass tacks on Superman." He was referring to "Action Comics." He added, "The early panels describing the birth of SUPERMAN and how he came to this planet could well be expanded into several weeks releases, we think."

On April 13, 1938, he suggested that I submit the two-weeks' sample releases of SUPERMAN around July 1st.

I wrote a detailed two weeks "Superman" daily strip continuity account of Superman's origin on the planet Krypton; how his father and mother placed their infant child in a rocket ship and sent him to Earth, moments before Krypton exploded. And how, upon reaching Earth, the infant was rescued from the flaming space craft and grew up to become crusading SUPERMAN. I sent the script to McClure Syndicate.

(Decl. Marc Toberoff, Ex. R).

Just before he submitted the script to McClure, Siegel wrote the following letter to Detective Comics' president, J.S. Liebowitz, on April 18, 1938: [4]

Regarding SUPERMAN. In their latest letter, McClure has instructed us to draw up the two weeks release of SUPERMAN and get them submitted on July 1st. This, Joe and I will do. When we submit the drawn up strip to them, I'll inform you at once. I've no doubt but that if you drop in on the McClure

Newspaper Syndicate at that time to discuss matters, that your presence will aid materially in the selling of the strip.

(Decl. Marc Toberoff, Ex. S).

Siegel's unpublished memoir recounts what transpired thereafter:

On April 21, 1938, McClure responded that they preferred waiting until July 1: "Enclosed we return your continuity for your safe-keeping. Thank you for your energetic cooperation." I knew that periodical publishers often returned to contributors, upon request, the rights other than first serial rights. Wheeler-Nicholson had written to me that this was our arrangement. I wrote to Liebowitz [at Detective Comics] that I had a newspaper syndicate interested in syndicating "Superman," and I requested that newspaper syndication rights to "Superman" be returned to Joe [Shuster] and me.

In his letter to me dated June 9, 1938, Liebowitz replied, "While it is not our intention to hold you back in any way from a possible newspaper syndication of 'Superman', we are not in a position to give you what you ask for, that is a *complete* release. If and when a syndicate makes a definite offer for the use of 'Superman', we can get together so that all of us will benefit."

On June 13, 1938, M.C. Gaines of McClure wrote to me that since I had already completed the first two weeks of the SUPERMAN strip, I should now send the material to him. "I will take this matter up at the first opportunity and let you know what we decide to do."

Joe did a terrific art job of illustrating my script for these two weeks of the daily "Superman" strip. I mailed the strips to McClure Syndicate.

---

4. Incidentally, the same day that *Action Comics* No. 1 was first published.

(Decl. Marc Toberoff, Ex. R (emphasis in original)).

While waiting to hear back from McClure, Siegel pursued other newspaper syndicators to see if they might be interested in distributing a Superman newspaper comic strip, submitting with his pitch a copy of the two weeks' worth of material concerning Superman's origins. One other newspaper syndicator that expressed some positive feedback was The Register and Tribune Syndicate. Again, as explained by Siegel in his memoir:

Chas. E. Lounsbury of the Register and Tribune Syndicate wrote to me on August 10, 1938, in response to my letter of August [sic] 26, "We are impressed with your outline and especially your enthusiastic approach. We read with interest the optional two weeks' releases. They do strike us as exciting and original." He noted I had a proposal elsewhere, and said they could not give me a quick decision. But if I was still in the clear after Labor Day, they would be glad to hear from me.

On September 7, 1938, he again wrote that "such matters necessarily move rather slowly here.... Personally I like SUPERMAN very much and believe that with a few changes it has very good possibilities." He stated that if McClure Syndicate was in a position to take on the strip, he presumed I would go ahead. I informed Liebowitz [at Detective Comics] of these developments.

(Decl. Marc Toberoff, Ex. R; *see also* Decl. Marc Toberoff, Ex. T (September 7, 1938, letter from Managing Editor Chas Lounsbury to Jerome Siegel)).

Shortly thereafter, progress was made on the McClure front. In early September, 1938, Liebowitz summoned Siegel to New York City to discuss the McClure newspaper syndication proposal. (Decl. Marc Toberoff, Ex. R ("In early September, Liebowitz asked me to come to New York to discuss the matter of McClure's interest in syndicating 'Superman' ")). What happened during this early September meeting is later related in the June, 1941, Saturday Evening Post story, "Up, Up and Awa-a-y!":

From the fall of '38 on, it was all sail and no anchor. Amid the piteous sounds of syndicate editors kicking themselves, McClure negotiated with Donenfield [at Detective Comics] to handle the newspaper rights, Donenfield to receive 40 per cent. Superman was eventually placed in 230 daily and Sunday newspapers scattered throughout the Western Hemisphere. Donenfield's 1940 cut was $100,000.

The McClure negotiations were perceived by considerable unhappiness for the partners. They sensed—correctly— that syndicate editors, who had once turned Superman down, would soon come to them, hat in hand. They begged Donenfield to give back the syndicate rights.

"We can't do that," he replied, "but if one of you will come to New York, I'm sure we can work something out."

Sitting up all night in the coach for lack of sleeper fare, Siegel arrived, rumpled and yawning, to receive the proposition: If the partners would confine all their services to Donenfield for ten years, he would permit them to do strips for McClure, himself retaining an agent's 10 per cent—of McClure's gross, however, not his own 40 per cent. In the heat of discussion Siegel was frequently reminded that Donenfield owned all rights and could freeze the partners out. The boys signed a contract, which for the first year brought them an increase of less than $100 a month.

(Decl. Marc Toberoff, Ex. M).

The transaction was structured into two separate contracts, executed by the parties

on approximately September 22, 1938:[5] An employment agreement between Detective Comics, on one hand, and Siegel and Shuster, on the other hand; and a newspaper syndication agreement among all three: Detective Comics, Siegel and Shuster, and McClure.

The newspaper syndication agreement gave McClure an eight-month option for a "six days a week" Superman "daily strip." If exercised, Detective Comics agreed "to permit [Siegel and Shuster] to supply 'Superman' strip exclusively to [McClure] for syndication in newspapers [throughout the world], for a minimum period of five years from June 1, 1939," with an option for McClure to "renew the agreement for a further period of five years." "[I]n consideration," McClure agreed to pay "Detective ... forty (40%) per cent of the net proceeds from such syndication during the first year, forty-five (45%) per cent during the second year and fifty (50%) per cent thereafter." (Decl. Marc Toberoff, Ex. Q). Payment to Siegel and Shuster for their "work" created under the contract was to be done "solely" through Detective Comics.

The syndication agreement provided that Siegel and Shuster were to supply said material to McClure "on an advanced schedule of at least six weeks" so as to "insure ample time for distribution prior to release dates." If Siegel and Shuster failed to furnish said material in time, the agreement allowed Detective Comics to substitute "other artists to do the feature and strip." As to the Superman newspaper strip material supplied to it by Siegel and Shuster, the syndication agreement provided that McClure, not Detective Comics, would have "reasonable editorial supervision of the feature," which Siegel and Shuster promised to maintain "at the standard shown in the sample submitted." (Decl. Marc Toberoff, Ex. Q).

The syndication agreement also provided that monthly statements of McClure's net proceeds would be sent to "Detective and a copy to" Siegel and Shuster. Furthermore, *both* Detective Comics and Siegel and Shuster were given the right to inspect McClure's books and records "in reference to the feature, at any reasonable time." (Decl. Marc Toberoff, Ex. Q).

As to the copyright in the material published in the newspaper comic strips, the syndication agreement provided that it would be in McClure's name, with a "reversionary" interest in favor of Detective Comics at the conclusion of the contract's term. (Decl. Marc Toberoff, Ex. Q ("The material contained in the feature which we syndicate will be copyrighted in our name, but copyright reverts to Detective at the termination of this contract")). Toward that end, the syndication agreement made clear that "the title 'Superman' shall always remain the property of Detective," and that Detective Comics retained the copyright in Superman in all other media "except daily or weekly newspaper publication." (Decl. Marc Toberoff, Ex. Q ("Our agreement covers newspaper rights only. Radio, motion picture, silent and talkie, book and all other rights are retained and owned by Detective")). Finally, McClure agreed to provide to Detective Comics free of charge "all the original drawings of the 'Superman' strip, so that said drawings may be used by Detective in the publication" of its comic book magazines, but only "six months after [the] newspaper [strip's] release."

5. The agreements are dated September 22, 1938 (before the publication of *Action Comics* No. 6); however, correspondence between the parties establishes that Siegel and Shuster did not return the signed agreements to Detective Comics until September 30, 1938. (See Decl. Bergman, Ex. C).

The employment agreement notably differentiates provisions relating to newspaper strips and those concerning comic books. The agreement contained an opening declaration broadly asserting Detective Comics' rights to, among others, the Superman copyright. (Decl. Marc Toberoff, Ex. P ("We, Detective Comics . . ., are the exclusive owners of comic strips known by the titles 'Superman'")). The employment agreement further noted up front that Siegel and Shuster had, up to that time, been doing the "art work and continuity for [the Superman] comic[ ] for [Detective, and that Detective] wish[ed] [for them] to continue to do said work and hereby employ and retain you for said purposes for the period of this contract." The following sentence then recited Siegel and Shuster's agreement to "supply [Detective] each and every month hereafter, in sufficient time for publication in our monthly magazines, sufficient copy and art for each of said features each month hereafter." The agreement distinguished this duty from Siegel and Shuster's further duty under the syndication agreement: "You shall also furnish in sufficient time to properly perform the terms of an agreement we are executing together with you with the McClure Newspaper Syndicate, all of the art and continuity for the newspaper strip entitled 'Superman' called for by said agreement." (Decl. Marc Toberoff, Ex. P).

The employment agreement then spelled out the per page compensation rate Detective Comics would pay Siegel and Shuster for the respective comic book characters they had been supplying to the publisher at that time (Superman receiving the highest rate of $10 per page). Again, the agreement then distinguished this payment scheme with that for the artists' creation of the Superman newspaper strips:

> We further agree to pay you for the McClure Newspaper Syndicate strips which you may hereafter furnish pursuant to the above-mentioned contract with McClure, on the following basis:
>
> When we receive payment from McClure on the 40% basis mentioned in the contract, we shall retain 7½% and pay you 32½% of the "net proceeds" as defined in the McClure contract.
>
> When we receive payment from McClure on the 45% basis mentioned in the contract, we shall retain 9% and pay you 36% of the "net proceeds" as defined in the McClure contract.
>
> When we receive payment from McClure on the 50% basis mentioned in the contract, we shall retain 10% and pay you 40% of the "net proceeds" as defined in the McClure contract.

(Decl. Marc Toberoff, Ex. P).

As for ownership in the copyright to the newspaper strips, the employment agreement provided that Detective Comics would own "all" such "material" and, at Detective Comics' option, it could be "copyrighted or registered in [Detective's] name or in the names of the parties designated by us."

The employment agreement further provided that Detective Comics had the right to "reasonably supervise the editorial matter of all features" and the right to terminate Siegel and Shuster's employment if "the art and continuity of any feature shall not be up to the standard required for the magazines."

Moreover, the employment agreement provides that, should Detective Comics decide to re-print some of the Superman newspaper strips in its "magazines," Detective Comics would compensate the pair "at the above-mentioned page rate less the percentage which McClure receives for said syndication."

The employment agreement also contained a global (literally and figuratively) prohibition against Siegel and Shuster "hereafter" furnishing to anyone Superman material, whatever its form be it as a "comic" book, a "newspaper" strip, or something else; instead, the artists agreed that they "shall furnish such matter exclusively to [Detective Comics] for the duration of this agreement as such matter may be required by us or as designated by us in writing."

Around the time the syndication and employment agreements were signed by all the parties concerned, Liebowitz wrote a letter on September 28, 1938, to Siegel, commenting upon said agreements. In the course of his lengthy correspondence, Liebowitz reminded Siegel that, "[a]s I have pointed out to you many times, our company has very little to gain in a monetary sense from the syndication of this material. Also bear in mind, that we own the feature 'Superman' and that we can at any time replace you in the drawing of that feature and that without our consent this feature would not be syndicated and therefore you would be the loser in the entire transaction. . . . It is entirely up to you and Joe, whether you wish our pleasant relationship to continue and whether you wish the strip 'Superman' to be syndicated." (Decl. Michael Bergman, Ex. B). Siegel quickly responded that both he and Shuster "are anxious and ready to do our best on SUPERMAN so that all parties concerned will profit." (Decl. Michael Bergman, Ex. C).

With that, Siegel and Shuster produced daily newspaper strips for McClure under the terms of the September 22, 1938, syndication agreement from 1939 through 1943; the first daily newspaper strip (depicting the first day's worth of the two weeks of material created by Siege and Shuster in the spring of 1938) appearing in the *Milwaukee News Journal* on January 16, 1939:

The applications submitted by McClure (and, when approved, the certificates) for the original copyright term registration for the Superman newspaper strips (identified as a "PERIODICAL CONTRIBUTION") created and published from 1939 to 1943 listed "McClure Newspaper Syndicate" as the claimant and "Jerry Siegel and Joe Shuster" as the authors of the newspaper strips. (Decl. Michael Bergman, Ex. C).

No effort was made by any party throughout the initial term of the Superman newspaper strips published through 1943 to file a supplemental registration to make changes to the information contained in the original registrations.

Two applications for renewal term registrations were, however, submitted for the Superman newspaper strips in question

during the 1960s: First, National Periodical Publications Inc., as successor in interest to Detective Comics, submitted applications for a renewal registration claiming as proprietors in the copyright of the renewable matter in "a work made for hire," noting that said work was a "contribution to periodical or other composite work," namely, the specific newspaper issue in question. (Decl. Michael Bergman, Ex. C). Second, applications for a renewal registration were also made by Siegel and Shuster, listing themselves as authors of the renewable matter. (Decl. Marc Toberoff, Ex. A (Thomson & Thomson copyright report noting that "the copyrights in the [newspapers strips] originally published through 1943 were renewed ... in the names of Jerome Siegel and Joe Shuster, claiming as authors")).

Not long after Superman entered into newspaper syndication, it became apparent that McClure could not provide the editorial supervision over the material submitted by Siegel and Shuster as called for in the syndication agreement. Correspondence between the artists and their magazine editor at Detective Comics, J.S. Liebowitz, recount this increasingly rocky relationship. (Decl. Michael Bergman, Ex. D (April 21, 1939, letter from Liebowitz in which he notes "[e]very morning it seems to me I receive copies of criticisms and complaints sent to you by Miss Baker of McClure" and that "Mr. Nimis of McClure was here today and he stated that they definitely do not intend to go on as they are ... they feel that the time and effort and aggravation encountered in getting this thing going properly is not worthwhile because of your lack of cooperation")).

Eventually, by January, 1940, it was clear that McClure had outsourced its editorial supervision over the newspaper strips to editors at Detective Comics. (Decl. Michael Bergman, Ex. I (January 22, 1940 letter commenting that "[w]e've been having considerable talk about the daily releases on SUPERMAN, and I believe Jack [Liebowitz] is writing to you to have you send all the material here before it goes to the syndicate for release"); Ex. E (January 25, 1940 letter from Liebowitz reminding Siegel that "all copy must clear through our office"); Ex. F (February 8, 1940 letter remarking on the "present arrangement" of Detective Comics "editing of the strip")). The substance of the editorial comments contained in the correspondence from Detective Comics (both as to the Superman comic book and later also the newspaper strips), pertained for the most part to complaints about the pair's failure to follow its editorial directions and to submit material on time, leaving the publisher to have to quickly scramble to get the material to the printer to meet its deadlines.

There were, however, more substantive criticisms of both the script and artwork supplied by the pair, with specific changes either made to yet-to-be released material or suggested for later releases. (Decl. Michael Bergman, Ex. E) (noting that it was "unwise" to depict Clark Kent flying in the air without wearing Superman's costume, as had been done with "the last daily release"); Ex. H (returning 26–page script and suggesting that it be re-written for a 13–page story as "there is nothing important enough about the story to justify its going to such length"); Ex. I (cataloging critiques of specific artwork of "sketches" submitted by Shuster); Ex. M (complaining "that a great deal hasn't been done to make Lois look better," giving specific examples in which the artwork is deficient, and then drawing an image of Lois on the correspondence that the editor suggests "Shuster and his lads" use as an exemplar).

During the term of the syndication agreement, problems also arose with Sie-

gel and Shuster's ability to supply newspaper strips in a timely fashion to McClure. As a consequence, McClure turned to Detective Comics for "filler" material for "newspapers which carried the comic strip SUPERMAN in order to prevent said newspapers from terminating their syndication agreements with" McClure. (Decl. Bergman, Ex. S (Westchester referee finding of fact # 91)). Notably, Detective Comics did not supply in-house Superman newspaper strips, as was its right under the terms of the syndication agreement. Instead, Detective Comics "supplied" to McClure a Superman spin-off, the "comic strip LOIS LANE, GIRL REPORTER, ... without charge for use." (Decl. Bergman, Ex. S (Westchester referee finding of fact # 91)). In fact, Detective Comics and McClure entered into a side agreement in September, 1943, with reference to the Lois Lane newspaper strip's impact on the computation of the net proceeds to be divided among the parties. In the agreement, the two "agreed that ... 'net proceeds' for the purposes of computing [Siegel and Shuster's] return from the newspaper publication of Superman should be the entire gross receipts" from the same, "deducting therefrom only the cost of cuts and proofs." (Decl. Bergman, Ex. S (Westchester referee finding of fact # 102–103)). Detective Comics and McClure further agreed that "the compensation of the [in-house] artists engaged by Detective Comics to draw the releases of Lois Lane, Girl Reporter ... furnished by Detective Comics to McClure for newspaper syndication was to be deducted from the gross receipts of the Superman syndication as 'mechanical costs' in computing 'net proceeds.'" (Decl. Bergman, Ex. S (Westchester referee finding of fact # 102–103)). Siegel and Shuster were not parties to (nor were they apparently aware of) this arrangement between McClure and Detective Comics.

Later, McClure notified Detective Comics of its election to extend for five years (beginning from June 1, 1944) the term of the 1938 syndication agreement. Contemporaneously, McClure "assigned to Detective Comics ... all its rights, title and interest in all copyrights in [the] Superman" newspaper strips created during the preceding five years, "including all renewals and extensions thereof." (Decl. Toberoff, Ex. A at 5 (Thomson & Thomson copyright report, dated Feb. 29, 1996)).

During the same time period, the pair produced, under the terms of the employment agreement, Superman material for various comic book magazines published by Detective Comics, first in its serialized magazine *Action Comics*, then as a standalone feature in the self-titled comic book magazine *Superman*. The terms contained in the 1938 employment agreement were later altered in a modification agreement entered into between Detective Comics and the artists on December 19, 1939. In this modification agreement it was noted that, "while both [the artists] have continued to furnish art work and continuity for 'SUPERMAN,' ... Mr. Shuster no longer furnishes the art work" for the other strips to which the pair were under contract to produce, such as "Slam Bradley" or "Spy." The parties therefore agreed that, in exchange for Detective Comics being "free to make other arrangements" for "furnishing [the] art work" for these other comics, Siegel and Shuster's compensation for Superman comic book material (which the pair reaffirmed that they would "continue to furnish all [the] art and continuity" thereof) would be increased to $20 per page, and Detective Comics would pay the pair 5% of the net proceeds derived from the commercial exploitation of Superman outside that from comic books and newspaper syndication, and into such other mediums as "radio,

motion pictures, [and] the toy and novelty field." (Decl. Michael Bergman, Ex. A).

Detective Comics re-asserted that it had "the unrestricted right to adapt, arrange, change, transpose, add to and otherwise deal with [the Superman] comic strip . . . as [it] in [its] sole discretion . . . deem[ed] necessary." The agreement further contained Siegel's and Shuster's re-affirmation that Detective Comics was the "sole and exclusive owners of the comic strip entitled 'Superman' . . . and to all rights of reproduction . . ., including but not limited to the fields of magazine or other book publications, newspaper syndication, radio broadcasts, television, [and] motion pictures. . . ." It was also acknowledged by the pair that Detective Comics held "all right of copyright and all rights to secure copyright registration in respect of all such forms of reproduction either in [its] name or others at [its] exclusive option."

Not all the Superman comic book material supplied by Siegel and Shuster after the September, 1938, employment agreement was published by Detective Comics, although it remains unclear whether the pair was nonetheless paid for such material. For instance, plaintiffs have brought to the Court's attention the curious tale of "K–Metal from Krypton." In August, 1940, Siegel submitted a 26–page script, accompanied by multiple pages of illustrations (mainly pencil drawings, but some that had been inked) created by artists working in Shuster's studio that, in the words of comic writer and historian Mark Waid, "would have . . . radically" altered the then established Superman story line: Lois Lane learns that Clark Kent is Superman and the two agree to become partners and confidants; the first appearance of the kryptonite concept (referred to in the material as K–Metal derived from meteorite debris from the planet Krypton) and its debilitating effects on Superman's powers; and Superman first learning of his Krypto-

nian origins. Although the material was not published when initially submitted by Siegel, upon later being unearthed in DC Comics' library vault in 1988, copies of the material were circulated among the top brass at the company in the hopes of "obtaining Siegel's blessing to have the story re-illustrated and released . . ., but for whatever reason, nothing ever came of it." (Decl. Marc Toberoff, Ex. BB).

Eventually, disputes between Detective Comics and Siegel and Shuster led to the pair leaving the employ of Detective Comics in 1947, ending involvement by this talented pair in the further development of the Superman character.

## II. WORK MADE FOR HIRE UNDER THE 1909 ACT

Under the 1976 Act, an author's (or his or her heirs') ability to terminate a prior grant in the copyright to his or her creation does not apply to a "work made for hire" because the copyright in such a creation never belonged to the artist in the first instance to grant; instead, it belonged at the outset to the party that commissioned the work. *See* 17 U.S.C. § 304(c). This absolute bar to termination brings into sharp focus a question that has figured prominently throughout the parties' papers: Whether any of the vast body of Superman material created up to 1943 by Siegel, with either the assistance of Shuster, with the assistance of others, or alone, was a "work made for hire." If so, then plaintiffs (as Siegel's heirs) cannot terminate his grant of the copyright in that material, such a grant being merely a superfluous act that did not alter the pre-existing ownership rights to that copyright. *See Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 554 (2d Cir.1995) ("Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work").

Resolution of the work made for hire nature of this material is controlled by the governing body of law in existence at the time Siegel crafted this Superman material, that is, the 1909 Act and the precedent developed thereunder. *See Self–Realization Fellowship v. Ananda Church,* 206 F.3d 1322, 1325 (9th Cir.2000) ("Because all of the copied works were created before 1978, the Copyright Act of 1909 governs the validity of the initial copyrights"); *Twentieth Century Fox Film Corp. v. Entertainment Distributing,* 429 F.3d 869, 876 (9th Cir.2005) ("We first consider Twentieth Century Fox Parties' infringement claims under the now repealed Copyright Act of 1909 because [the work] was published before the ... effective date of the 1976 Copyright Act").

The 1909 Act provided that, "[i]n the interpretation and construction of this title[,] ... the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed). "Thus, with respect to works for hire, the employer is legally regarded as the 'author,' as distinguished from the creator of the work, whom Learned Hand referred to as 'the "author" in the colloquial sense.' " *Martha Graham Sch. and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.,* 380 F.3d 624, 634 (2d Cir.2004). Nowhere, however, did the 1909 Act define what was meant by "work made for hire" or "employer"; only the consequences flowing from such a designa-

tion were spelled out. The task of giving meaning to these terms was left to the courts. "Although for most of its life Section 26 was construed to extend work-for-hire status only to traditional employer-employee relationships," by way of demonstration that the work was done within the scope of one's job duties with their employer, "in the late 1960s, in limited circumstances, some courts began expanding the definition of 'employee' to cover authors outside the traditional employment relationship," to those involving "an independent contractor," but only if it could be shown that "the work was made at the hiring party's 'instance and expense.' " 2 PATRY ON COPYRIGHT § 5:84.[6]

■ However, in 1965, the Ninth Circuit was the first court to utilize the "instance and expense" test to determine whether works created either by independent contractors or employees were ones made for hire. *See Lin–Brook Builders Hardware v. Gertler,* 352 F.2d 298 (9th Cir.1965).[7] Said inclusion was done by the court formulating an across-the-board presumption in favor of finding work-for-hire ownership whenever a work is produced at the "instance and expense" of the hiring party, said presumption only subject to being overcome by evidence that the parties did not intend for such a result:

[W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an

---

**6.** Prior to this expansion, invocation of the instance and expense test to independent contractors only resulted in a determination that the commissioned party had assigned to the commissioning party the copyright for the initial term, leaving the renewal term in the work with its creator. *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,* 342 F.3d 149, 160 (2d Cir.2003).

**7.** Plaintiffs object to the across-the-board application of the "instance and expense" test set forth in *Lin–Brook* for determination of the

for-hire status of all the works at issue in this case, arguing that at the time the works were created in the late 1930s and early 1940s, the law governing work for hire extended only to the traditional employer-employee relationship. Whatever appeal plaintiffs' argument may otherwise have, it has been rejected by the Ninth Circuit. *See Twentieth Century,* 429 F.3d at 877 (holding that rejection of the retroactive application of *Lin–Brook* to evaluating works created by independent contractors would "overturn forty years of established case law within this circuit").

artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin–Brook*, 352 F.2d at 300 (noting that the presumption was not overcome because there was no evidence "as to the circumstances or intendment" of the parties); *see also Twentieth Century*, 429 F.3d at 881 ("[t]he presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire"). The test sought to match the concept of a work made for hire with the purpose of the Copyright Act, that is, to "promote" the creation of "useful Arts." U.S. Const. Art. 1, § 8. As one court explained: "[T]he law directs its incentives towards the person who initiates, funds and guides the creative activity, namely, the employer, but for whose patronage the creative work would never have been made. Copyright law 'is intended to motivate the creative activity of authors ... by the provision of a special reward,'" namely, the legal protection afforded to such creative property through copyright. *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 62 U.S.P.Q.2d 1301, 1316 (S.D.N.Y.2002) (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)). Toward that end, the instance and expense test requires the evaluation of three factors: (1) At whose instance the work was prepared; (2) whether the hiring party had the power to accept, reject, modify, or otherwise control the creation of the work; and (3) at whose expense the work was created. *See Twentieth Century*, 429 F.3d at 879, 881.

■■■ The "expense" requirement is met where a "hiring party simply pays an [employee or] independent contractor a sum certain for his or her work." *Playboy Enterprises*, 53 F.3d at 555. Such regular, periodic payments of a sum certain bear the hallmark of the wages of an employee required to produce the work in question for his or her employer, and not that of a party who is free to engage with those other than the commissioning party in marketing his or her work. *See Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 642–43 (2d Cir. 1967). "In contrast, where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." *Playboy Enterprises*, 53 F.3d at 555; *see also Twentieth Century*, 429 F.3d at 881 (finding that "expense" requirement met when publisher agreed to pay the creator "a lump sum for writing the book, instead of negotiating a royalty deal").

■■■ Finally, in speaking of the expense in the creation of the work, the focus is not on who bore the costs or expense in physically creating the work itself (the money spent to purchase the paper on which the dialogue and story elements was printed, the typewriter used to put into concrete form the author's concepts of the same, and the pencils and ink needed to draw the illustrations, etc.). That particular consideration relates to the question of whether "an artist worked as an independent contractor and not as a formal employee," a distinction, as made clear after the Ninth Circuit's decision in *Lin–Brook*, that has "no bearing on whether the work was made at the hiring party's expense." *Playboy Enterprises*, 53 F.3d at 555. Instead, the focus is on who bore the *risk* of the work's profitability. *See Twentieth Century*, 429 F.3d at 881 ("there is little doubt that the book was authored at [the publisher's] expense. [The publisher] took on all the financial risk of the book's success, agreeing to pay [the writer] a lump sum for writing the book, instead of negotiating a royalty deal"); *Picture Music*,

*Inc. v. Bourne, Inc.,* 314 F.Supp. 640, 651 (S.D.N.Y.1970) (noting that "the fact that the author was obliged to repay advances on royalties which were never accrued is an indication that the relationship was not an employment for hire").

■■ The "instance" component of the test inquires into "whether 'the motivating factor in producing the work was the employer who induced the creation.'" *Twentieth Century,* 429 F.3d at 879; *see also Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213, 1217 (2d Cir.1972) (concluding that the fact the employer took the "initiative in engaging" the author to create the work rendered it as one made for hire). That the commissioning party be the motivating factor is not a "but for" test—that is, but for the artist's employment the work would not have been created—but instead is a more narrow inquiry focused on the nature and scope of the parties' business relationship. As one court explained:

> No doubt Graham was a self-motivator, and perhaps she would have choreographed her dances without the salary of Artistic Director, without the Center's support and encouragement, and without the existence of the Center at all, but all that is beside the point. The fact is that the Center did employ her to do the work, and she did the work in the course of her regular employment with the Center. Where an artist has entered into an explicit employment agreement to create works, works that she creates under that agreement cannot be exempted from the work-for-hire doctrine on speculation about what she would have accomplished if she had not been so employed.
>
> . . . .
>
> There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employ-

ment. Many talented people ... are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project. "Instance" is not a term of exclusion as applied to specific works created within the scope of regular employment. It may have more significance in determining whether an employee's work somewhat beyond such scope has been created at the employer's behest or to serve the employer's interests. . . .

*Martha Graham Sch.,* 380 F.3d at 640–41.

■ Thus, "under the 1909 Act[,] a person could be an employee yet create a work 'as a special job assignment, outside the line of the employee's regular duties.' In that event, the work is not a work for hire." *Id.* at 635 (citing *Shapiro Bernstein & Co. v. Jerry Vogel Music Co.,* 221 F.2d 569, 570 (2d Cir.1955)). The critical factor is what was the nature of the creator and publisher's business relationship (be it as an employer-employee or an commissioner-independent contractor) at the time of the work's creation, and whether the work in question falls within the scope of those job duties. It is for this reason that courts concern themselves with "the degree to which the hiring party had the right to control or supervise the artist's work," as its presence would reflect a circumstance found when the work being created was done so within the confines of the pre-existing employment relationship. *Twentieth Century,* 429 F.3d at 879; *see also Donaldson,* 375 F.2d at 643 (labeling as an "essential element" the "power to direct and supervise the manner in which the writer performs his work"); *Picture Music,* 314 F.Supp. at 650 ("The existence of an arrangement going beyond an assignor-assignee relationship prior to the undertaking of the particular work. The antithesis of such an arrangement is a case where an author creates a work of his own

volition and then sells it to a proprietor"). Although it is not critical that the commissioning party actually exercise its right of control and supervision in the creation of the work in question, it is necessary that the party *have* the right to direct, control, or otherwise shape the artist's work. *See Martha Graham Sch.*, 380 F.3d at 635 ("The *right* to direct and supervise the manner in which the work is created need never be exercised" (emphasis in original)); *Picture Music*, 314 F.Supp. at 651 (labeling as "crucial" whether the hiring party had "[t]he right . . . to direct and supervise the manner in which work is performed").

Moreover, there are certainly gradations of control a publisher could and may have exerted in the creation of the work, and the greater the extent of such supervision the "more likely it is that the work was created at the commissioning party's instance." *Twentieth Century*, 429 F.3d at 880. Thus, a publisher providing suggestions and comments on galleys to a novel, for instance, may move into the realm of that associated with a work made for hire depending on the degree and pervasiveness of said interaction. *Id.* (labeling "the degree of in-person supervision was much greater than" what the publisher "usual[ly]" did, including utilizing the services of fact-checker and "regular face-to-face meetings" by the author "with [the publisher's] editorial board" at which the author was "provided . . . with extensive notes and comments").

## III. APPLICATION OF THE WORK FOR HIRE DOCTRINE TO THE RELEVANT WORKS

There are four major categories of Superman works over which the parties are contesting the work for hire nature: (A) Superman material created by Siegel before the March 1, 1938, grant (including *Action Comics* No. 4 and portions of *Superman* No. 1); [8] (B) Superman *comic book* material published in the interim period after the March 1, 1938, grant but before the execution of the September 22, 1938, employment and syndication agreements (namely, the material appearing in *Action Comics* Nos. 2–3 and 5–6); [9] (C) the remaining Superman *comic book* material created by Siegel and Shuster beginning immediately after the execution of the September, 1938, employment and syndication agreements and continuing until the close of the five-year termination window on April 16, 1943 (namely, *Action Comics* Nos. 7–61 and *Superman* Nos. 1–23); and (D) Superman *daily newspaper comic strips* published beginning in January, 1939 (under the auspices of the September 22, 1938, syndication agreement) and continuing through April 16, 1943 (the close of the five-year termination window).

### A. Pre–March, 1938, Superman Material (Action Comics No. 4 and portions of Superman No. 1)

Beginning with the earliest Superman comic book material, there seems little doubt that any Superman material that Siegel created by himself or with the assistance of others prior to the March 1, 1938, grant, and that was later published, is not a work made for hire. That was a core holding in this Court's March 26, 2008, Order, which itself was built upon the finding the Second Circuit made during the parties 1970s' litigation over the renewal term rights to the Superman copyright.

8. The Court previously considered the issue of whether *Action Comics* No. 1 was a work made for hire. *See Siegel*, 542 F.Supp.2d at 1126–28. Nothing contained in this Order is meant to supersede that Order.

9. Although *Action Comics* No. 4 was *published* during this period, given that the dialogue thereto was arguably *created* during the pre-March, 1938, period, the Court will treat its work for hire nature there.

*See Siegel,* 542 F.Supp.2d at 1126–28 ("Accordingly, . . . all the Superman material contained in *Action Comics,* Vol. 1, is not a work-made-for-hire and therefore is subject to termination."); *Siegel,* 508 F.2d at 914. Adapting the language from the Second Circuit decision, the Superman material in question had been crafted by the artists years before the relationship between its authors and its ultimate publisher existed. The creation of this material was not done at the instance and expense of anyone other than the artists themselves.

The dispute is thus not with the work for hire nature of this material, but rather over whether any of the following material either contains copyrightable elements or suffers from some other defect preventing termination from occurring: (1) The "future Superman exploits" paragraph written before the publication of *Action Comics* No. 1; (2) the Superman material found in *Action Comics* No. 4, which was based on Siegel's 1934 script and the other 1934 material created by Siegel and Keaton; and (3) the first six pages of *Superman* No. 1.

### 1. *Paragraph on Superman's Future Exploits*

■ As for the one paragraph concerning future exploits, there is no doubt that the concepts embodied in that paragraph later found concrete expression in some of the earliest Superman material published in *Action Comics.* Plaintiffs' counsel, however, would have the Court conclude that, based on this one scant paragraph and its later fuller expression of the concepts contained therein, the Superman materials found in *Action Comics* Nos. 2, 4, and 5

were created prior to the March 1, 1938 grant. The problem with this argument is that the paragraph itself constitutes mere *ideas* for future works rather than *expressions* of those ideas, and thus contains no copyrightable material, which, of course, bars any effort at termination. *See* 17 U.S.C. § 304(c) (limiting termination to the grant in the "copyright" to a work).

■ "A copyright never extends to the 'idea' of the 'work,' but only to its 'expression,' and that no one infringes, unless he descends so far into what is concrete as to invade that 'expression.'" *National Comics Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 600 (2d Cir. 1951) (L. Hand, J.). Aside from the addition of a few adjectives, Siegel's one paragraph of future Superman exploits has much more in common with Judge Learned Hand's conception of the general idea of a play about "a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress" than with its concrete expression in the form of Shakespeare's play "Twelfth Night." *See Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir. 1930). To turn Judge Hand's phrase, Siegel's one paragraph of future exploits was little more than a generalized description of Superman performing an unelaborated task or heroic feat, the precise details of which were left to be sketched out at a later time, as later occurred, around the time the comic books were published during 1938.[10] Here, Siegel did little more than sketch the idea of his superhero doing some broad-brushed act, the details being left to be filled in later, as they

---

10. For instance, in the story in *Action Comics* No. 2, Superman thwarts the efforts of an industrialist war profiteer who is secretly funding both sides in a war in a far-off land ("Superman will win a war single-handed"), that leads to Superman battling aircraft ("bat-

tle an airplane with his bare hands"), swimming great distances in the ocean ("he'll swim several hundred miles and think nothing of it"), rescuing Lois Lane from being executed by a firing squad, and ending with the industrialist repenting his actions.

were when he put the idea into concrete form by writing a script setting down precisely how and why Superman "battles an airplane with his bare hands." In this sense the one paragraph sets out little more "than the most general statement of what the [comic] is about." *Id.* The generalized description Siegel put down to paper concerning Superman's "exploits" did not cross the line into something to which copyright protection applies and, accordingly, to which no right to termination attaches.

### 2. *Superman Material Created while Siegel Was Collaborating with Keaton*

 As far as the Superman material created by Siegel during his collaboration with Keaton is concerned, save for one important exception, that material never acquired statutory copyright protection under the 1909 Act, as it was either never published with the requisite notice or registered as an unpublished work. The termination provisions apply only to a work for which the "copyright [therein was] subsisting in either its first or renewal term on January 1, 1978." 17 U.S.C. § 304(c). Unless the material had been registered as unpublished works under section 12 to the 1909 Act, copyright protection could be achieved only by publication of the material, before January 1, 1978, bearing the requisite copyright notice. *See Siegel,* 496 F.Supp.2d at 1150; 3 PATRY ON COPYRIGHT § 7:42 ("Section 304(c) ... by its own terms covers only works in either their first or renewal term on January 1, 1978. The section thus does not cover works that were unpublished" on that date); 3 NIMMER ON COPYRIGHT § 11.02[A][1] at 11–12 ("the termination provisions of Section 304(c) apply only if the work in question was the subject of statutory copyright prior to the effective date of the current Act"). There has been no evidence presented that any of the Siegel/Keaton material was registered as an unpublished work under the 1909 Act, nor is there any indication that any portions of the Siegel/Keaton material (other than that appearing in *Action Comics* No. 4) was ever published with the requisite notice before 1978. Thus, although not works made for hire, most of the Siegel/Keaton material is not subject to termination.

 The same, however, cannot be said of the 1934 Superman football story script written by Siegel and sent to Keaton. Defendants do not dispute that the storyline contained in *Action Comics* No. 4 published nearly verbatim the entirety of the script, as it surely did. *See generally Siegel,* 496 F.Supp.2d at 1150–51 (discussing what was sufficient to demonstrate "publication" of material for purposes of the 1909 Act).

Instead, defendants object to the Court's consideration of the script on evidentiary grounds, complaining that the script had never been produced in discovery, that it has not been authenticated, and that plaintiffs have failed to provide the source of the material and how they came into possession of it. (Defs.' Obj. to Pls.' Sept. 22, 2008 ¶ 7). None of these evidentiary objections are well-taken. Plaintiffs have submitted declarations evidencing that the script in question was in the possession of Russell Keaton's widow who turned it over, along with other materials, to the family's literary and marketing agent, Denis Kitchen, in 1993. Mr. Kitchen thereafter on August 21, 2008, posted a comment in response to a blog story titled "Russell Keaton, Superman's Fifth Beatle," wherein he disclosed that, in addition to the subject of the story (which concerned the illustrated strips, but not the scripts, Siegel and Keaton had created concerning the version of Superman as someone from Earth's future), "there's LOTS more correspondence and scripts."

Plaintiffs' counsel thereafter ran across Kitchen's post while searching the Internet, and after contacting him obtained a copy of the script, which he then promptly produced. (Sept. 23, 2008 Decl. Toberoff; Sept. 23, 2008 Decl. Joanne Siegel; Sept. 29, 2008 Decl. Denis Kitchen).

Defendants also apparently argue that plaintiffs should be precluded from acquiring any ownership stake in the artwork found in *Action Comics* No. 4, as no artwork was contained in Siegel's 1934 script. As stated in their papers: "Even if accepted in evidence ..., the allegedly pre-existing continuity pertaining to *Action Comics* # 4 would not signify that the artwork and any new text in this comic book were pre-existing as opposed to being prepared after March 1, 1938 as work for hire." (Defs.' Obj. to Pls.' Sept. 23, 2008, filing ¶ 4). The record is devoid of any evidence indicating when the artwork later found in *Action Comics* No. 4 was created. However, also missing is what specific legal argument defendants seek to raise based on that silence in the record. For instance, the Court is left to wonder whether their challenge is based on an assertion that Shuster's artwork appearing in *Action Comics* No. 4 is a work made for hire on the basis that it was created following the March 1, 1938 grant; or are they asserting that Siegel's script lacks sufficient originality as to preclude any effort by plaintiffs to recapture the copyright in the artwork contained in *Action Comics* No. 4 as part of a joint work; or is it for some other unarticulated reason? Defendants have had ample time and opportunity to precisely articulate their legal argument flowing from this factual assertion, and they have failed to do so. The Court has permitted defendants to file four post-hearing briefs related to any of the issues raised at oral argument or in opposing counsel's papers that were filed following the hearing. Accordingly, being unable to discern the legal basis for defendants' argument, the Court declines to address the significance of defendants' unelaborated observation. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir.1994).

This is not to say, however, as plaintiffs would have the Court find, that Siegel writing in 1934 the script ultimately published in *Action Comics* No. 4 (that was but an expression of one of the ideas found in his "future Superman exploits" paragraph) likewise means that Siegel also wrote the other Superman material that are expressions of these other ideas found in that one paragraph (such as that found in *Action Comics* Nos. 2 and 5) during the same time frame. There is no evidentiary basis to support such an inference. The evidence surrounding the 1934 football story script gives no indication that, other than the script in question, Siegel had written or planned on writing more Superman scripts. The one future Superman exploits paragraph itself makes no mention that scripts for the ideas therein had been or were in the process of being crafted by Siegel. The cover letter Siegel submitted to Keaton with the enclosed football story script likewise contains no indication that Siegel had or was planning on writing more scripts. Rather, the evidence supports the inference that the script was created as a discrete project to woo a prospective publisher.

Accordingly, because, as illustrated herein, the material appearing in *Action Comics* No. 4 is based almost verbatim on Siegel's pre–1938 script, the Court finds that the Superman material appearing therein was not a work made for hire and is subject to termination.

### 3. *Superman No. 1, pages 1–6*

This leaves the question of whether the first six pages in *Superman* No. 1, which in all other respects consist of nothing more than a reprint of the Superman

**1064**

comic from *Action Comics* Nos. 1–4, contains within it any additional pre-March 1, 1938, material.

Defendants label as "grossly exaggerated" the notion that the continuity to these first six pages were written by Siegel in 1934. (Defs.' Obj. to Pls.' July 28, 2008 Opp. Br. at 13). To this end, defendants point to the fact that Siegel wrote in his memoir, *"The Story Behind Superman No. 1,"* that a Detective Comics' editor, M.C. Gaines, wrote a letter to the pair on March 27, 1939, "specifying in detail [what] the contents of [those] 'first six pages' [should entail], including specific headings and panels." (*Id.*) It is defendants' factual characterization, not plaintiffs', that exaggerates. The letter referenced by defendants makes clear that it was the first *two* pages of the six at issue that was created at and the subject of Mr. Gaines editorial direction. Mr. Gaines remarked that insofar as the "first six pages" of *Superman No. 1* was concerned, the publisher would like the pair to take the first page from *Action Comics* No. 1, "and by elaborating on this one page," "work up *two* introductory pages" for *Superman* No. 1. (Decl. Marc Toberoff, Ex. GG (emphasis in original)).[11] However, as to pages three through six in *Superman* No. 1, there is nothing in Mr. Gaines' letter indicating that the material was created contemporaneously with *Superman* No. 1's publication in 1939. Quite the opposite is true.

Specifically, Mr. Steranko's forward to DC Comics' 1989 re-printing of *Superman* No. 1 recounts the origins of pages three through six as consisting of the first week of material Siegel and Shuster had created in 1935. It had been intended by the artists to be part of *Action Comics* No. 1, but it was "eliminated" by Detective Comics from inclusion in *Action Comics* No. 1 in order to make more space available for other comics. Given that no evidence has been submitted to rebut Mr. Steranko's statement (contained in one of defendants' publications, no less), the Court finds that pages three through six of *Superman* No. 1 is material created by Siegel and Shuster in 1935 and thus was not a work made for hire.[12]

Thus, in addition to that set forth in the Court's earlier orders, the uncontroverted evidence establishes that the following works were not works made for hire and are thus subject to termination: *Action Comics* No. 4 and *Superman* No. 1, pages three through six.

**B. *Post–March 1, 1938, Superman Comic Book Materials Published Prior to September, 1938, Employment Agreement (Material Appearing in Action Comics Nos. 2–3 and 5–6)***

With respect to the comic books containing Superman material that were published by Detective Comics in the in-

---

11. Plaintiffs' argument that the first two pages in *Superman* No. 1 were created before the March 1, 1938, grant is equally unconvincing. Plaintiffs point to various scripts Siegel wrote to Keaton in 1934 to support this claim; however, too many discrepancies exist between those scripts and the two published pages in *Superman* No. 1 to support the conclusion sought by plaintiffs. Moreover, this argument is in direct contradiction to Siegel's own account, set forth in his memoir, of the date the first two pages of *Superman* No. 1 were created, which he places squarely in 1939.

12. Defendants conclusorily argue that the contents of the story line (but not the illustrations) contained in pages three through six of *Superman* No. 1 are nothing more than *"de minimis"* elements, to which no copyright would attach. Other than offering this legal conclusion, nowhere have defendant provided any specific factual argument directed to what or how this continuity is defective. Defendants have had ample opportunity to elaborate on this argument, but have not. Accordingly, the Court declines to consider it.

terim period after the March 1, 1938, grant and the September, 30, 1938, employment agreement, namely *Action Comics* Nos 2–3 and 5–6, defendants' principal argument for why the instance element was met is because Detective Comics was the rights holder in the underlying Superman material contained in *Action Comics* No. 1 by virtue of the March 1, 1938, grant, and thus its consent was required before any derivative Superman material could be published. In essence, defendants once again lean heavily on the derivative nature of the work itself to demonstrate they had the right to control its creation. As the Court remarked in resolving the work for hire status of the Superboy script created by Siegel in 1940, the fact that a work is a derivative of another does not automatically translate into it being considered a work for hire or as being produced at the instance of the owner of the pre-existing work; something more is required. *Siegel*, 496 F.Supp.2d at 1142–43.

Here, however, there is more than just a naked argument regarding the derivative status of the works in question. There is correspondence from Detective Comics to Siegel and Shuster noting the publisher's expectation that the pair would continue to generate derivative works of Superman for further publication in its comic book magazines even after the character's initial release in *Action Comics* No. 1. In an April 8, 1938, letter, Detective Comics executive J.S. Liebowitz remarked that the company had "loaded [the pair] up with 43 pages a month [said sum including the pair's work on other comic book features for the publisher such as "The Spy" and "Slam Bradley" as well as Superman]," noting that "the success of the magazine is dependent on the type of work done by yourself," and then concluding that he was "looking for your complete cooperation for our mutual benefit." (Decl. Michael Bergman, Ex. B). Likewise, the January 10, 1938, letter from Detective Comics' editor refers to Super-

man as a "new feature" that could overburden Shuster's time.

This correspondence certainly suggests that the Superman material after *Action Comics* No. 1 was provided pursuant to an implicit agreement between the artists and the publisher to furnish said material on a regular basis for the publisher. In essence, Detective Comics had already set aside space in its comic book publications to accommodate the artist's Superman material even before the character's first appearance in *Action Comics* No. 1. This point is reinforced by the fact that in *every succeeding* monthly issue of *Action Comics* for the period in question there appeared a feature of Superman. Indeed, at trial in the 1947 Westchester suit Shuster testified that in accepting Detective Comics' offer, the pair anticipated that they would see Superman's publication in *Action Comics*. (Decl. Marc Toberoff, Ex. N). Furthermore, the referee in the 1947 Westchester suit made a factual finding that the artists were regularly paid for the material created during this interim period at the rate of $10 per page.

Given this correspondence, the regular appearance of the Superman feature in subsequent publications, and the general understanding of the artists themselves, the evidence leads the Court quite naturally to the conclusion that the creation of the Superman material appearing in *Action Comics* Nos. 2–3 and 5–6 was solicited by and done at the instance of defendants. *See Playboy Enterprises, Inc. v. Dumas*, 960 F.Supp. 710, 715 (S.D.N.Y.1997) (holding that fact that paintings were furnished and published on a regular basis, and that they were described as a "regular feature," "suggest[ed] that the magazine had an implicit agreement with [the painter]" to produce those works, which was, in turn, "persuasive proof of [the publisher's] role" in

the works' creation), *aff'd without published opinion*, 159 F.3d 1347 (2d Cir.1998).

Plaintiffs seek to undermine such an impression by making much of the fact that there was no written agreement between the parties following the March 1, 1938, grant wherein Detective Comics specifically commissioned the pair to create subsequent Superman comic book stories. (Pls.' Opp. at 8 (noting that the March 1, 1938 grant "could have but did not provide for the employment of Siegel and Shuster to create subsequent Superman stories")). In plaintiffs' view, the entire relationship between the parties for this six-month period following the grant is akin to that of a screenwriter submitting a "spec screenplay" to a studio with the hopes that it would be purchased. (Pls.' Opp. at 5). Such a characterization of the parties' relationship fails to weave in all aspects of that relationship.

Undoubtedly plaintiffs are correct that, in creating this material, there was no guarantee by Detective Comics that it would accept it and thereby pay Siegel and Shuster for their work. The first issue of Superman could have been a commercial flop, leading the publisher to reconsider whether to continue to publish such material or to place the character in the hands of different comic book artists. Because there was no guarantee of success, continuation of the parties' business relationship could have ended abruptly and early, thus placing Siegel and Shuster's role with Detective Comics further afield than under the traditional employee-employer scenario. That said, the pair's business connection to their "employer" (in the colloquial sense) was much stronger and closer to that of other admitted work for hire scenarios (*e.g.,* an independent contractor) given the nature of the project and the material they were supplying to Detective Comics. *Cf. Self–Realization Fellowship Church,* 206 F.3d at 1326–27 (noting that a monk's writings and religious lectures created while the monk was supported by the church was not a work made for hire as the monk had less of a connection to the church than another would have had in a traditional employment setting).

To begin, Siegel and Shuster were not simply creating some random work and submitting it to a number of publishers for consideration; the comic book material was for a character to which the publisher to whom it was submitted owned the pre-existing rights, rendering Siegel and Shuster's material as but a derivative thereof. Moreover, the material was submitted at the request of Detective Comics. Again, the letters from Detective Comics' executives in January and April, 1938, indicate that the Superman material first published in *Action Comics* No. 1 was not intended to be a one-shot deal, but rather was conceived of as an ongoing "new feature" to which sequels would need to be fashioned; hence, the Detective Comics executives' reference in the April 8, 1938, letter to the "43 pages a month" the pair had been "loaded up" with by the publisher, a page computation that included within it the 13–page Superman comic book, and the January, 1938, letter voicing concerns regarding the possibility of placing undesirable constraints on Shuster's time. Perhaps the best way of envisioning the parties' business relationship at this time was one in which the artists were given a trial period of sorts to see whether their creation would be commercially successful enough to warrant further formal action by the publisher. Thus, the material over this six-month period was not sent on spec to see whether the publisher would like it, but rather was sent as requested for publication in a monthly feature in the hopes that the publisher would eventually decide to formally pick up the feature on a long-term basis.

This characterization of the parties' relationship during this period is confirmed by the September, 1938, employment agreement's recital that Siegel and Shuster "have been doing the art work and continuity for us" and that Detective wanted the pair "to continue to do said work and hereby employ and retain you for said purpose." In essence, the September, 1938 employment agreement formalized what had informally been ongoing beforehand. That Detective Comics' requests were made on an informal basis before the written agreements were executed does not detract from the fundamental fact that Siegel and Shuster's creation of the derivative Superman material was done at the request and instance of Detective Comics. That Detective Comics waited six months before more formally "employing" the pair to "continue" to do just that does not detract from the core point that such production by Siegel and Shuster was again done at the instance of Detective Comics; it simply shows that by that point Superman had so proven itself a commercial success that the publisher desired a more formalized arrangement to be placed down in writing to ensure that the pair would continue to produce such material for it (rather than going on to create other comic book characters for other publishers).

When these facts are considered in toto, it is easy to conclude that creation of the works in question lie further along the spectrum from that found in a more traditional employment relationship, as is the case for the comic books created by in-house employees of the publisher. The lack of any long-term guarantee or commitment by the publisher to the business enterprise itself, however, is not something which is atypical in an independent contractor situation. That the pair functioned in such a loose employment relationship with the hiring party is not critical. What is important is the existence of an engagement to create the works, and the level of control and direction the commissioning party thereafter had over creation of the works in question. And in that regard, the fact that Siegel and Shuster were commissioned by the publisher to create specific material to which the publisher had the statutory right to exert control over its creation, and for which they were paid upon the material's publication, is dispositive as to the instance prong.

In short, Detective Comics, as the copyright holder of the pre-existing work, approached the artists and asked that they create works derived from that preexisting material on a regular basis, and then paid the artists for that derivative work. As such, the material would fall within the category of a work made for hire. *Burroughs*, 342 F.3d at 163; *Picture Music*, 457 F.2d at 1216. Accordingly, the Court finds that the Superman material in *Action Comics* Nos. 2–3 and 5–6, which were published in the interim period after the March 1, 1938, grant but before the execution of the September 22, 1938, employment agreement were works made for hire. The Superman material appearing in *Action Comics* No. 4, although *published* during this same interim period, was not a work made for hire because it consisted of material *created* in 1935. *See supra* III.A.2.

C. **Post–September, 1938, Superman Comic Book Material (Action Comics Nos. 7–61 and Superman Nos. 1–23)**

■ It is clear to the Court that all of the *comic book* material produced by Siegel and Shuster *after* they signed the employment agreement with Detective Comics were works made for hire. The employment agreement makes plain that the pair were specifically "employ[ed] and retain[ed]" by Detective Comics for a period of five years (with an option to ex-

tend for an additional five years) to produce, on an ongoing basis, the comic book magazines for certain characters, including Superman, in return for payment of a sum certain upon that materials' publication. Such an arrangement has all the elements of a relationship leading to the creations of works made for hire.

■ Plaintiffs' argument regarding the "instance" prong of the test centers upon the contention that, although Detective Comics *retained* a great deal of editorial control over Siegel and Shuster's comic books, it actually *exercised* very little. That the two were permitted to exercise their creative talents largely, or even exclusively, in the manner they chose is not dispositive of whether the comics were prepared at Detective Comics' instance. *See Martha Graham Sch.*, 380 F.3d at 640–41 ("There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment. Many talented people, whether creative artists or leaders of major corporations, are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project"). "Complete control over the author's work is not necessary" to meet the instance test, *Twentieth Century*, 429 F.3d at 880, all that is required is the right to direct and supervise the manner in which the work is created, and even then, "the *right* to direct and supervise ... need never be exercised." *Martha Graham Sch.*, 380 F.3d at 635 (emphasis in original).

Here, Detective Comics contractually reserved for itself the right to "reasonably supervise the editorial matter of all features," a right which in some instances it did exercise to provide editorial supervision over that material before it was published, suggesting changes to the art work and the continuity submitted by the pair.

While this supervision perhaps did not rise to the level the publisher in *Twentieth Century* exercised over the author's manuscript, *see* 429 F.3d at 880 (explaining that "the degree of in-person supervision was much greater than usual, including regular face-to-face meetings between General Eisenhower and Doubleday ... where the editorial board provided him with extensive notes and comments" as opposed to the normal process of "waiting for the manuscript to be completed, and then discussing possible improvements with the author"), nowhere did the Ninth Circuit suggest that such heightened supervision was necessary to demonstrate that the work was produced at the instance of the publisher.

Magnifying the extent of Detective Comics' right to control the Superman comic books' creation is the fact that it was also the holder of the underlying material from which the later Superman comic books were derived. The fact that Detective Comics approached Siegel and Shuster and, in a written agreement, specifically engaged (and paid) for them to create comic book material derived from the underlying Superman material it already owned, lends strong support to the conclusion that said comic books were made at its instance. *See Burroughs*, 342 F.3d at 163; *Picture Music*, 457 F.2d at 1217; *Siegel*, 496 F.Supp.2d at 1143 ("It was these additional elements of requesting and paying for specific derivative works that served to demonstrate that the creation of the derivative work was at the instance of the commissioning party").

In this respect, the circumstances of this case are not all that different from those in *Martha Graham School*. Before being hired by a dance center, the artist had created/choreographed various dances. Later she was hired as the artistic director (receiving a regular salary) for the dance

center and charged with choreographing new dances, which she did to great success. In her position as director of the dance center, the artist had nearly free rein in the type and manner of the dances she created. Nonetheless, the Second Circuit held that, because the works in question fell specifically within the class of duties for which the artist was hired to perform (the creation of dances), those works were made for hire. This case is no different. Siegel and Shuster were undisputedly charged after September 22, 1938, with supplying Detective Comics "each and every month" the comic book material for Superman. The works in question fall precisely into the duties the employment contract called on Siegel and Shuster to perform, thus meeting the "instance" prong of the work made for hire test.

As for the "expense" prong, the plaintiffs argue that the contingent nature of Detective Comic's obligation to make payment for the material created (upon its acceptance for publication), coupled with the fact that Siegel and Shuster had to bear up-front costs (in more of an independent contractor role than a traditional employee), negates this element. This method of payment, plaintiffs argue, renders the present case distinguishable from other "sum certain" cases where the artists were paid regardless of whether their work was accepted for publication. However, plaintiffs have failed to present evidence that Siegel and Shuster were not, in any given instance, paid for their work. Although there is evidence that at least one of the works produced by Siegel and Shuster, "K–Metal from Krypton," was not accepted for publication by Detective Comics, nowhere have plaintiffs pointed to any direct evidence indicating that the pair were not paid for this rejected submission. Plaintiffs speculate, rather than substantiate, this point.

Plaintiffs attempt to fill this evidentiary vacuum by pointing to declarations from comic book historians who state that the industry practice at the time was for artists only to be "paid for pages actually delivered by them and eventually published by" the comic book publisher. (Pls' Opp. at 20). As the Court noted previously, appeals to expert opinion of industry custom and practice are of "dubious evidentiary value" owing to the fact that the expert in question is not venturing any opinion as to what actually occurred with respect to the specific business relationship between Detective Comics and Siegel and Shuster. Siegel, 542 F.Supp.2d at 1130.

Moreover, the language in the parties' December, 1939, modification agreement creates the strong inference that Shuster had been paid by Detective Comics for all or a portion of that prior year's artwork for comic strips (other than Superman) that he did not supply. Furthermore, as disclosed in the 1947 Westchester action, Detective Comics decided near the end of the five-year period in question to pay Siegel and Shuster for Superman material that neither had contributed in creating. See Siegel, 496 F.Supp.2d at 1138. These instances of payment for material not created by the artists establishes that the parties' business relationship was anything but that fitting within the industry norm of which the experts opine. It also demonstrates that, despite plaintiffs' appeal to the "possibilities" of payment given the contractual terms, the parties' actual business relationship belied those terms. In the end, the parties' actual pattern and practice under the terms of the agreement speaks louder on the expense prong of the work for hire question than such textual contingencies; all the Court has been presented with in this regard are appeals to such possibilities and contingencies that could, but for which there is no evidence ever did, take place.

Plaintiffs also emphasize all the costs, expenses, and overhead Siegel and Shuster incurred in running their own artists' studio (payments to assistants, payment of rent, purchasing art tools and supplies, etc.,) in producing the material they then supplied to Detective Comics, as demonstrating that the expense prong has not been met. In the end, this evidence suggests that the artists' relationship with Detective Comics, even when under contract to produce the material in question, was more distant from that of traditional employees and closer to that of independent contractors; however, as noted above, the instance and expense test under the 1909 Act also applied to independent contractors. *See Siegel*, 496 F.Supp.2d at 1138 ("[C]ourts employing the instance and expense test have discounted reliance on the circumstances and the cost borne for the production of the work. Such consideration relates to the question of whether 'an artist worked as an independent contractor and not as a formal employee,' a distinction that has 'no bearing on whether the work was made at the hiring party's expense.'") (quoting *Playboy Enterprises*, 53 F.3d at 555). The "expense" prong of the test is therefore met.

Accordingly, applying the "instance and expense test," the undisputed evidence establishes that the Superman materials created by Siegel and Shuster during the term of their employment agreement (namely, *Action Comics* Nos. 7–61, and to *Superman* Nos. 1–23) were works made for hire.[13]

### D. *Superman Newspaper Strips Published from 1939 to 1943*

This leaves the last and most difficult category—the newspaper strips for the period 1939 to 1943—which the Court further subdivides into two categories: (1) the two weeks' worth of newspaper strip material Siegel and Shuster created *before* the syndication agreement was executed and (2) the remaining newspaper strips the pair created thereafter under the aegis of that agreement. Because the Court's ruling regarding the first two weeks' worth of newspaper strips implicates more far-reaching issues, which are discussed in subsequent sections, the two sub-categories are addressed in reverse chronological order. However, before the Court may address the work for hire aspect of the newspaper strip materials, it is necessary to discuss the significance of McClure's role in the September 22, 1938, agreements.

The complexity of the work for hire question on this last category of material is due in large measure to the added dimension of McClure's presence in the newspaper syndication endeavor, which altered and rearranged Detective Comics' and the artists' then-existing business relationship. To be sure, McClure has served as the proverbial elephant in the room in this case, an elephant whose significant impact on the business relationship created through the September 22, 1938, employment agreement and newspaper syndication agreement both sides have sought to either ignore or diminish. Defendants seek to relegate McClure to the role of a mere licensee of the newspaper strips for which it owned nothing, lest the material be injected into the public domain because McClure's listing itself as the proprietor in the copyright notice and registration would arguably violate the prohibition on divisibility of copyright in the 1909 Act.[14] For

---

**13.** The material appearing on pages three through six of *Superman* No. 1 is the single exception to this conclusion. *See supra* section III.A.3 (holding that these pages were not works for hire).

**14.** As noted by Professor Nimmer, under the

their part, plaintiffs contend that, in light of defendants' concession, McClure's role as a prospective hiring party for a work made for hire may be ignored, but thereafter structure their analysis of the relevant agreements to reach their desired conclusion that the creation of the newspaper strips enured solely (and was so intended to enure solely) to McClure's benefit. Such an analysis is favored by plaintiffs because it seemingly forecloses a conclusion that the newspaper strips were made at Detective Comics' instance and expense.

Although each side frames the issue differently, both do so in a manner that limits the analysis of the work for hire issue to the artists and Detective Comics. (Pls.' Opp. to Defs.' Sur–Reply at 6; Defs.' Reply at 9 n. 8). However tempting it is to follow suit, the Court cannot so easily unburden itself from confronting the relevant evidence in the record and is instead tasked with attempting to give legal meaning to that evidence.

In determining the significance of McClure's role, the Court does not write on an empty slate. The significance from a copyright perspective of the terms in these very agreements was previously litigated and adjudicated by the courts, a fact which neither party brought to the Court's attention in their briefs, at oral argument, or in the numerous unsolicited post-hearing briefs submitted.

In 1941, Detective Comics filed suit against Fawcett Publications, alleging that Fawcett's comic book character Captain Marvel, a character who possessed super strength and super speed, who wore a skin-tight costume with a cape, and who hid his superhero identity by way of a radio-reporter alter ego, infringed the copyright to Superman. Thus began a twelve-year legal battle. As a defense to the action, Fawcett argued that the copyright to Superman had entered the public domain due to asserted defects in the manner and form in which McClure had affixed copyright notices on the publications of the Superman newspaper strips. *See National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 93 F.Supp. 349, 356 (S.D.N.Y.1950) (cataloguing the various forms to which McClure affixed, or in some cases did not even attempt to affix, a copyright notice for the newspaper strips). Detective Comics' response was that it could not be charged with any defects in

1909 Act, "it was inferred" by the courts that because the 1909 Act "referred in the singular to the 'copyright proprietor' ... the bundle of rights which accrued to a copyright owner," such as the right to reproduce the material on the stage or in books, "were 'indivisible,' 'that is, incapable of assignment in parts.'" 3 NIMMER ON COPYRIGHTS § 10.01[A] at 10–5. Absent the complete assignment of rights commanded by the copyright, the transfer was considered to be a license, with the transferor maintaining ownership in all the rights to the copyright in the material. *Id.* Given this, any publication of the material by the transferee was required to contain a copyright notice in the name of the copyright owner (that is, the transferor); other actions, such as the transferee's publication of the material carrying a notice only in its name, would result in publication without proper notice, thereby injecting the material into the public domain. 3

NIMMER ON COPYRIGHTS § 10.01[C][2] at 10–12 to 10–13. In light of the rapid development of different forms of media in which material could be reproduced, pressure began to build against continued adherence to the doctrine of indivisibility, resulting in the creation of various judge-made exceptions to its application. *Id.* at 10–6 to 10–7. One such exception crafted by some courts was conceptualizing "such rights" conveyed as being "held in trust for the benefit of the" transferor but with "legal title" resting in the name of the transferee thereby allowing for the publication with notice thereto in the name of the transferee. *Id.* at 10–13 to 10–14; *see also Runge v. Lee*, 441 F.2d 579 (9th Cir.1971). As Professor Nimmer observed, such judge-made exceptions effectively "administered a death blow" to the doctrine "even under the 1909 Act." 3 NIMMER ON COPYRIGHT § 10.01[B] at 10–9.

the copyright notice as those "were errors and omissions of McClure, by which it is not bound, for McClure was merely a licensee, and a licensee cannot relinquish or abandon the rights of his licensor." *Id.* at 357. Thus, the relationship of the parties to one another in the 1938 newspaper syndication agreement vis-à-vis ownership of the copyrights to the Superman newspaper strips assumed critical importance in resolving the case. *See Detective Comics, Inc. v. Fawcett Publications, Inc.,* 4 F.R.D. 237, 239 (S.D.N.Y.1944) (noting that Fawcett's defense would render "the status of McClure, insofar as 'Superman' is concerned, and the validity of its copyrights relating thereto, . . . a material inquiry").[15]

At trial, the district court rejected Detective Comics' argument that McClure was merely a licensee. Instead, the district court determined that the arrangement put in place by the newspaper syndication agreement was in the nature of a joint venture. *See Fawcett Publications,* 93 F.Supp. at 357 ("I think that this contention is unsound, as the agreement with McClure was not a mere license to use the strips but an agreement of joint adventure"). As explained by the district court:

> The agreement with McClure contains all the elements of a joint adventure. The subject matter of the joint enterprise was the use of the "Superman" strips for the sole purpose of newspaper syndication. The artists agreed to create and draw the strips, Detective agreed to pay them for their work and to furnish the strips to McClure, and McClure agreed to sell the strips to newspapers. Both the artists and Detective agreed to cooperate with McClure. The proceeds of the sales

(there could be no losses) were to be divided between Detective and McClure. *Id.* The district court held that McClure took a valid copyright to the newspaper strips, but not because it was an "author, . . . proprietor, . . . [or] an assign"; rather, the district court held that the agreement's provision permitting McClure to copyright the strips in its name (which later reverted to Detective Comics) was a permissible manner by which a valid copyright could be taken. *Id.* at 358.

In light of this finding, the district court determined that "the errors and omissions of McClure" were indeed "chargeable to Detective," observing that "the rights and obligations of joint adventurers are substantially those of partners, and each participant in a joint adventure is an agent for the other." *Id.* The district court thereafter found that "with few exceptions," the newspaper strips were published without proper copyright notices and therefore the copyrights in the material for the same were abandoned into the public domain. *Id.*

On appeal, the Second Circuit, in a decision by none other than Judge Learned Hand, reversed and remanded. At the outset, the court noted that although characterizing the parties' agreement as one of joint venture would have "the same effect upon the copyrights in suit as though McClure were the proprietor," it found it unnecessary to decide whether that characterization was correct (although not without Judge Hand making the astute observation that the entire concept of joint venture is "one of the most obscure and unsatisfactory of legal concepts") as it concluded that "McClure was indeed the 'proprietor' of the copyrights" in the Superman newspaper strips and not a licensee of the same.[16] *National Comics Publica-*

---

**15.** When Detective Comics later merged into and became National Comics Publications, Inc., the latter was substituted as plaintiff.

**16.** It was noted, however, that insofar as McClure simply borrowed existing Superman comic book material published previously by Detective Comics and then reprinted it for

*tions, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 599 (2d Cir.1951) ("We agree with the result, but because we think that 'McClure' was indeed the 'proprietor' of the copyrights, and for that reason we do not find it necessary to decide whether the contract constituted a 'joint venture'"). Thus, as a matter of copyright law, the acts and omissions of McClure vis-à-vis the copyright notices affixed to the material when it was published were chargeable to Detective Comics.

Judge Hand noted that his conclusion was compelled by both the statute and from construing the parties' intent as revealed in the agreements. Only if McClure was determined to be a "proprietor" could its publication of the newspaper strips be done in such a manner that would secure copyright protection under the 1909 Act. *Id.* ("it is only on the assumption that 'McClure' was the 'proprietor' of the 'work'—*i.e.*, of the 'strips' prepared by the 'Artists' under the contract— that any valid copyrights could be secured by publication in the 'syndicated' newspapers"). Under Section 9, only "author[s] or proprietor[s]" were entitled copyright a work; section 10 provided that an author or proprietor could obtain copyright "by publication" with the "required" notice affixed; and section 19 detailed the required contents of that notice. Thus, unless "McClure was a 'proprietor' of the 'strips' the purpose of the parties to copyright them was defeated," a result to be avoided if it is possible to construe the words of the agreement to effectuate that purpose. *Id.*

Judge Hand found that the text of the syndication agreement compelled such a construction. *Id.* ("we say that the text [of the agreement] itself comports only with the conclusion that 'McClure' was to be the 'proprietor'"). Toward that end, the agreement was read as in effect placing ownership of the copyright with McClure to be held in trust for its intended beneficiary—Detective Comics. As Judge Hand ably explained:

[T]he "material"—the "strips"—is to be copyrighted in 'McClure's' name, but the copyright "reverts to Detective at the termination of this contract." That necessarily meant that, until the contract came to an end, "McClure" was to have the "title" to the copyrights, for property cannot "revert" from one person to another unless the person from whom it "reverts" holds title to it. Even though he holds it in trust, its fate depends upon his acts, not upon his beneficiary's. The sentence which immediately follows reinforces this conclusion; it reads: "The title 'Superman' shall always remain the property of Detective." That disclosed a plainly deliberate distinction between the word, "Superman," used as a "title," and the "works" which were to be produced in the future and published by "McClure" in the "syndicated newspapers": the title was to remain "Detective's" "property"; the copyrights were only in the future to become its "property." In final confirmation of this interpretation is the clause in which "McClure" assumed "to provide Detective with all the original

---

newspaper syndication then "at best 'McClure' could have become no more than a licensee." *Id.* at 600. McClure's copyright proprietor position with respect to the newspaper strips was for that material "which were produced and published under the contract of September, 1938." *Id.* at 601. Nowhere have the parties in the instant case sought to delineate which of the strips (out-

side the first two weeks of strips, which no one suggests was borrowed material) fall into these respective categories. Given the Court's ultimate disposition of the work for hire nature of the newspaper material produced after the September, 1938, agreement is concerned, the Court declines to address this issue.

drawings . . . so that said drawings may be used by Detective in the publication 'Action Comics' six months after newspaper release." That is the language of a "proprietor," who assumes power to license another to copy the "works." Since for these reasons "McClure" became the "proprietor" of any copyrights upon "strips" published under the contract, in so far as it failed to affix the "required" notices upon the first publication of a "strip," and upon each copy published thereafter, the "work" fell into the public domain.

*Id.*

As a result of this conclusion, Judge Hand determined that insofar as McClure sent out "mats" to newspapers without any notice at all for the strips, the copyrights in those strips were indeed lost to the public domain. *Id.* at 601. The matter was remanded to the district court to conduct a new trial, in light of the court's narrowing of the class of strips that could be considered abandoned, on whether any newspaper strips placed at issue were validly copyrighted, and, if so, whether Fawcett's Captain Marvel character infringed the copyright contained therein. *See National Comics Publications, Inc. v. Fawcett Publications, Inc.,* 198 F.2d 927 (2d Cir.1952). Thereafter, the parties settled their dispute.

Accordingly, defendants' characterization of McClure as nothing more than a mere "licensee" of the newspaper strips with no legal title to the copyright in question was raised and rejected by the *Fawcett* decision. Defendants are bound by that judgment.

Applying *Fawcett* to the terms in the syndication agreement, the Court finds that, in essence, McClure and/or Siegel and Shuster (depending on whether the work was made for hire) obtained a grant (the "permission" noted in the agreement) from Detective Comics to the newspaper

rights in the underlying, preexisting Superman material; that permission was provided so that both could engage in the creation of a separably copyrightable derivative work (the newspaper "strips" referenced by Judge Hand of which McClure was the "proprietor") based on said preexisting material owned by Detective Comics.

In this sense, discussion of divisibility is misplaced. As Professor Nimmer has noted by way of illustration strikingly similar to the circumstances presented in this case, even under the 1909 Act a party could hold the separate copyright contained in a derivative work, the pre-existing material of which was owned by a third party, without transgressing notions of indivisibility:

> [T]he producer of a motion picture . . . is undoubtedly the proprietor of the copyright in the resulting film. The film itself may be a derivative work based for example upon a novel. In order that the [film] not constitute an infringement of the novel the producer must obtain a grant of "motion picture rights" in the novel. However, because he was the proprietor of the final film did not under the 1909 Act render him the "proprietor" of the motion picture rights [in the novel]. He was the licensee of the motion picture rights in the novel but the proprietor of the derivative work motion picture.

3 NIMMER ON COPYRIGHT § 10.01[B] at 10–9 n. 30. The same holds here. McClure was the licensee of the "newspaper right" in the underlying Superman copyright held by Detective Comics, but was an owner of the copyright in any of the new material found in the derivative newspaper strips.

Therefore, McClure's position as a "proprietor" and holder of legal title to the separate copyright in these derivative newspaper "strips" renders it conceivable

that the creation of those strips were made at its "instance and expense" (and thus a work for hire).[17] Thus, as alluded to earlier, although plaintiffs would prefer otherwise, the Court cannot escape consideration of the issue of whether the newspaper strips were works made for hire for McClure (rather than just Detective Comics).

### 1. Post–September, 1938, Newspaper Strips

In order to evaluate whether the post-September, 1938, newspaper strips were made for hire, the Court first considers how the terms in the agreements themselves should be construed as a matter of contract law. Plaintiffs urge the Court to look at the terms in each agreement separate and apart from those contained in the companion agreement, treating the two agreements as standing alone as separate business deals. Defendants characterize the agreements as but subparts in a "total transaction" such that the terms contained therein "run together because this whole thing is one business." In defendants' view, McClure was "just the . . . agent or the syndication arm of [an] arrangement" that "centered around Detective" Comics, and thus the terms in the agreements should be construed in conjunction with and as applying to those in the other agreement.

The Court finds both characterizations partly accurate. The terms in each agreement do overlap with, make reference to, and fill gaps in the other. However, there are areas in each agreement which are self-contained and unaffected by terms contained in the other agreement.

The employment agreement, for instance, bolsters the provision in the newspaper syndication agreement wherein the artists agreed "to maintain [the newspaper strips they submitted] at the standard shown in the sample submitted" by containing a provision within it that requires the artists to "properly perform the terms" in the newspaper syndication agreement. Likewise, the employment agreement fills in the blanks from the newspaper syndication agreement as to how and in what manner the artists would be compensated. The employment agreement also added a further dimension to a term in the syndication agreement by describing how the artists will be paid if, under the syndication agreement, Detective Comics later used the newspaper strips in its comic books (paying the artists at their normal "page rate less the percentage which McClure receives for said syndication"). Similarly, the newspaper syndication agreement expressly notes that payment for the artists' work would be addressed in the employment agreement.

In contrast, the self-contained aspects of the agreements are best illustrated by those relating to the hiring parties' *contractual* right to control and supervise the creation of the material crafted by the artists. Thus, for instance, the employment agreement provided Detective Comics a *contractual* right (as opposed to right to control inherent in fact that material was derivative of that to which Detective Comics held the rights to the underlying work) to control or supervise creation of "features." It is clear in reading the employment agreement that when it used the

---

**17.** "[T]he term 'proprietor' [was] used by the 1909 Act and case-law under it to refer" not only to those who are owners by assignment, but also "to employers who induce the creation of a work made for hire and thus own the copyright in it." *Burroughs*, 62 U.S.P.Q.2d at 1320 (citing *Shapiro, Bernstein & Co. v. Bryan*, 123 F.2d 697, 700 (2d Cir. 1941) ("[W]hen the employer has become the proprietor of the original copyright because it was made by an employee 'for hire,' the right of renewal goes with it, unlike an assignment")).

term "features" it did so solely in reference to the artists' production of a comic book, describing the same as a "monthly feature," "monthly magazine," or "magazine." In contrast, when the employment agreement made reference to the artists' production of newspaper strips it employed terms such as "newspaper strips," "McClure Newspaper Syndication strip," "material furnished for syndicate purposes," and "syndicate matter." Just as importantly, in the one paragraph in the employment agreement that prohibited the artists from exploiting Superman with anyone else save Detective Comics and McClure, the agreement separately identifies each class of works rather than through use of defendants' purported global term "feature." (*See* Decl. Marc Toberoff, Ex. P ("You agree that you will not hereinafter at any place ... furnish to any other person, firm, corporation, newspaper or magazine any art or copy for any comics to be used in any strip or comic or newspaper or magazine containing [Superman]")).

In applying the "instance and expense" test, the crucial question for the Court is how Siegel and Shuster fit into this scheme devised by the publisher and the newspaper syndicator.[18]

The Court begins with evaluating the expense element, which is made more complicated due to the method by which the pair were paid for the strips in question. Rather than being paid a salary or a sum certain for the newspaper strips, the artists were paid only a percentage of any "net proceeds" that their strips generated, that is, a royalty payment. Generally, this manner of payment tends to rebut the notion that the newspaper strips were made for hire. *See Martha Graham Sch.*, 380 F.3d at 641 (noting that "evidence that Graham personally received royalties for her dances ... may rebut[ ]" the notion that the dances were made for hire); *Playboy Enterprises*, 53 F.3d at 555 ("in contrast, where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship"); *Twentieth Century*, 429 F.3d at 881 (finding that expense requirement met when publisher agreed to pay the author "a lump sum for writing the book, instead of negotiating a royalty deal"); 2 PATRY ON COPYRIGHT § 5:61 ("Where payment is solely by royalties, this fact weighs against an employment relationship").

The fact that payment of a sum certain might be forthcoming to the pair for their work six months later if Detective Comics decided to reprint those newspaper strips in its comic books does not detract from the fundamental nature of the transaction as being geared toward a profit-sharing arrangement as the principal method of compensation for all involved. Moreover, defendants have not offered any evidence to show whether or to what extent Detective Comics actually exercised this option to reprint the newspaper strips, thus obligating Detective Comics to pay Siegel and Shuster a sum certain for those works.

Indeed, the ongoing and extent of the financial risk assumed by Siegel and Shuster with regards to the newspaper strips was significantly higher than they had borne in any of their other business dealings involving Superman. With respect to the comic book strips, any financial risk assumed by the pair for the expenses in-

---

**18.** *Fawcett* left unanswered the question of how McClure acquired ownership of the copyright in these derivative newspaper strips. Was it acquired by assignment from the artists or by their creation of the material as a work for hire? Or was it acquired through an assignment from Detective Comics, who initially owned the copyright in the works at their inception as works made for hire? For the Court's purposes, this distinction is not of particular importance.

curred in creating the material would be quickly ameliorated by the publisher's decision to publish or not (a process taking only a matter of days or perhaps weeks). With respect to the newspaper strips, in contrast, such expenses could be borne for months or even longer depending entirely on the material's commercial success.

Admittedly, questions concerning the particular method of payment for the work have lessened in importance over the years in determining whether it was one made for hire. As Patry has written in his treatise, "[b]oth the Second and Ninth Circuits have taken a nuanced look at compensation," allowing courts to turn aside or otherwise diminish the importance that receipt of payment was in royalties has insofar as whether something was a work for hire. 2 PATRY ON COPYRIGHT § 5:61 (citing *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir.2003) ("That some royalties were agreed upon in addition to this sum is not sufficient to overcome the great weight of the contractual evidence indicating a work-for-hire relationship") and *Playboy Enterprises*, 53 F.3d at 555 (wherein the court observed that royalty payments are not conclusive)).

Diminishing the importance of this evolution, however, is the fact that, in nearly all of these cases, the authors of the works in question were paid a salary or some other sum certain in addition to the receipt of royalties. *See Estate of Hogarth*, 62 U.S.P.Q.2d at 1317 ("Where, as here, the creator receives both a fixed sum *and* royalties, the fact that the creator received a fixed sum is sufficient to meet the requirement that the works be made at the employer's expense"); *Warren*, 328 F.3d at 1142 (creator received a fixed sum in addition to royalties). Here, Siegel and Shuster were paid only royalties. Such a financial arrangement, especially when viewed through the realities of the parties' relationship, places this case on the outer edges of the work for hire doctrine.

There are, however, other features present related to the works creation (factors centered on the instance prong) that go to the core of what is envisioned by a work made for hire relationship. Clearly, Siegel and Shuster were engaged (however viewed, by McClure or by Detective Comics, or by both) to create the material. They were clearly done at the instance of *either* McClure, Detective Comics, or both. The syndication agreement (reinforced by the employment agreement) tasked the pair as part of their job duties with the creation of the works in question. Siegel and Shuster could be replaced if they did not submit their work on time. Just as critically, the right to control the process in creating the work was doubly reinforced between the pair's employers: McClure possessed the contractual right to supervise the artists' work (which it in fact exercised for a period of time) and Detective Comics possessed the additional right to supervise and control the work as the rights holder of the pre-existing Superman material utilized in the creation of the derivative newspaper strips. This engagement to create and this right of control over the artist's creation of the work is not indicative of a joint venture with the artists; rather, it is reflective of a more traditional employment engagement.[19]

---

**19.** Moreover, the arrangement lacks some of the key elements for a joint venture to be found under New York law: A sharing of some degree of control over the venture and a sharing of the *losses* (as well as the profits) from the venture. *See Itel Containers Intern. Corp. v. Atlanttrafik Exp. Service Ltd.*, 909 F.2d 698, 701 (2d Cir.1990) (setting forth test under New York law for joint venture); *Dinaco Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir.2003) (holding for a joint venture the parties "must submit to the burden of making good the losses" of others to the venture); *In re PCH Associates*, 949 F.2d 585, 602 (2d Cir.1991) (right to inspect books and records

In essence, read together, the syndication agreement and employment agreement is suggestive of a loaned employee arrangement (although the "employees" were more accurately viewed as independent contractors). *See* 2 PATRY ON COPYRIGHT § 5:79 n. 1. Detective Comics retained a measure of control over the artists; McClure retained control over the works those artists created and that it intended to exploit for the benefit of Detective Comics, McClure, and the artists themselves. However those duties were conceived and to whomever they were owed, the fundamental point remains that the instance in creating those newspaper strips rested with someone other than Siegel and Shuster.

In this respect, the Second Circuit's decision in *Picture Music,* which applied the instance and expense test,[20] is eerily similar to the facts presented here.[21] There, the issue presented was whether the adaptation of the musical score, "Who's Afraid of the Big Bad Wolf," from the Walt Disney cartoon, "The Three Little Pigs," into a song was a work made for hire.

Walt Disney and Irving Berlin, Inc. (apparently the author of the musical score), believed that the score from the movie could be made into a popular song. With Disney's approval, Berlin engaged Ann Ronell, an apparent freelancer, to assist in the adaptation; "she did so, rearranging the musical themes in collaboration with an employee of Berlin, and arranging the existing lyrics and adding new ones of her own." 457 F.2d at 1214.

Disney thereafter agreed that, "[i]n exchange for an agreement to pay certain royalties[, it would] assign all its rights in the new song to Berlin," and further agreed that "either one-third or one-fourth of its royalties should be paid to Miss Ronell for her services." *Id.* The copyright in the song was subsequently registered in Berlin's name, with a credit of authorship to Ronell and Frank Churchill, the Disney employee who had composed the original score for the film. *Id.* at n. 1.

Thereafter, when the right to seek the renewal term accrued, Ronell claimed that she owned a one-half interest in the song. Berlin's successor in interest defended by asserting that Ronell's contribution to the song was a work made for hire. Notwithstanding that Ronell was paid only royalty payments (and not a "fixed salary"), the Second Circuit agreed.

Much like the present case, the *Picture Music* case involved three parties, not the usual two parties to an employer-employee relationship. In *Picture Music,* an artist freelanced with another party (Berlin) to adapt a score owned by a third party (Disney) into a song. The Second Circuit was unconcerned with this variation on the more ordinary dyad business relationship and method of payment: "The purpose of the statute is not to be frustrated by conceptualistic formulations of the employment relationship." *Id.* at 1216.

Also much like the present case, the Second Circuit found a right to control the artist's work on the part of both of the other parties, although one party had more direct control than the other: "[T]he trial court found that employees of Berlin did in fact make some revisions in Miss Ronell's

---

not sufficient control for purposes of establishing a joint venture).

**20.** Although not expressly discussing the two separate prongs of the instance and expense test, *Picture Music* clearly applied both, as the Court does here. *See Burroughs,* 342 F.3d at 160 (2d Cir.2003).

**21.** The Ninth Circuit has on more than one occasion cited approvingly to the Second Circuit's decision in *Picture Music. See Twentieth Century,* 429 F.3d at 880; *Warren,* 328 F.3d at 1142.

work. Moreover, since Disney had control of the original song on which Miss Ronell's work was based, Disney (and Berlin, with Disney's permission), at all times had the right to 'direct and supervise' Miss Ronell's work." *Id.*

Although certain initial copyright registrations designated Siegel and Shuster as the "authors" of the newspaper strips, the registration certificates in *Picture Music* listing the artist as the song's "author" was disregarded in favor of the realities of the parties' relationship; so too, here, the fact that McClure took it upon itself to list Siegel and Shuster as the "author" of the newspaper strips is effectively rebutted when one looks to the realities of the parties' actual business relationship. *See Burroughs*, 342 F.3d at 166–67 ("A certificate of registration creates no irrebuttable presumption of copyright validity . . . [w]here other evidence in the record casts doubt on the question, validity will not be assumed").

Finally, and for the Court's current purpose, most importantly, the court clearly considered the method of payment for Ronell's work—solely by way of royalties—not dispositive of whether the song was made for hire: "The absence of a fixed salary, however, is never conclusive, nor is the freedom to do other work, especially in an independent contractor situation." *Picture Music*, 457 F.2d at 1216.

As the *Picture Music* court summed up its holding: "In short, the 'motivating factors' in the composition of the new song, 'Who's Afraid of the Big Bad Wolf,' were Disney and Berlin. They controlled the original song, they took the initiative in engaging Miss Ronell to adapt it, and they had the power to accept, reject, or modify her work. She in turn accepted payment for it without protest. . . . That she acted in the capacity of an independent contractor does not preclude a finding that the song was done for hire." *Id.* at 1217.

The Court can here sum up its ruling in an almost identical manner. After the execution of the syndication and employment agreements, the artists did not independently decide to create the newspaper strips; rather, they did so because they were contractually obligated to do so and because they expected to receive compensation for their creations. McClure retained editorial supervision rights over the material; it could "accept, reject, or modify [the pair's] work." Detective Comics owned the original work from which the derivative newspaper strips were created; it agreed to allow Siegel and Shuster to continue to create derivative works based upon it. Siegel and Shuster assented to this arrangement. That they did so in the capacity of independent contractors, like the artist in *Picture Music*, "does not preclude a finding that [the newspaper strips] were done for hire."

Thus, the Court concludes that the instance and expense test is met, and that the newspaper strips were works made for hire. However the duties of the artists were conceived, and to whomever they were owed, the fundamental point remains that the instance in creating those newspaper strips Siegel and Shuster rested with someone other than themselves. Such indicia of a work for hire relationship insofar as the creation of the newspaper strips is concerned is reflected in the facts that the employment agreement obligated them to timely supply—"shall furnish"—the necessary material to McClure; the syndication agreement specified that the copyright in that material belonged to McClure, not Siegel and Shuster; and the syndication agreement noted that, if the pair did not meet their obligation of timely supplying such material to McClure, Detective Comics could appoint someone else to create the Superman newspaper strip. Far from suggesting that the creation of the material fell outside the scope of the pair's rights

and duties under the auspice of their employment with Detective Comics, the agreements demonstrate how deeply enmeshed and integral the creation of such newspaper strips were to Siegel and Shuster's job.

Of course, the splitting of the employer role between McClure and Detective Comics makes the characterization of that role (*i.e.*, whether the true employer was McClure or Detective Comics, or both) a much more difficult question, but that difficulty is easily surmounted for purposes of the present inquiry: Whether the artists created the newspaper strips within the scope of their job duties. This they clearly did.

Moreover, although in some circumstances the royalty payments could lead to a conclusion (as suggested by plaintiffs) that the parties entered into a joint venture, here, the peculiar structure of the arrangement does not (as it did not in *Picture Music*) alter the core nature of the relationship. Specifically, the arrangement "employ[ed]" the artists to provide art work and continuity to Detective Comics and to "furnish," as part of their duties, the newspaper material to McClure. The arrangement allowed the artists to be replaced by other artists if they failed to do so in a timely manner. Thus, as in *Picture Music*, the fact that the pair were paid in royalties rather than a sum certain does not alter the relationship in such a fashion as to lead to the conclusion that the works were not made for hire. Indeed, the parties' arrangement left no doubt that Siegel and Shuster's role in creating the material could be (and was in fact) substituted by other artists should they fail to timely supply such material. In this respect, Siegel and Shuster's role was much like that of an employee or independent contractor retained to perform a job, not that of a partner to a joint venture.

In sum, this case, much like *Picture Music*, lies on the outer boundaries of what would constitute a work made for hire, but given that the core elements sought to be captured and addressed by the doctrine are present, the Court finds that the newspaper strips created by Siegel and Shuster after September, 1938, were works made for hire and, accordingly, the termination notices submitted by plaintiffs do not reach the grant to those works.

Thus, because the Court finds that the newspaper strips created by Siegel and Shuster after September 22, 1938, were works made for hire, the right to terminate does not reach the grant to those works.

### 2. *Pre–Syndication Agreement Newspaper Strips*

In stark contrast to the post-syndication agreement newspaper strips, it is clear from the record that the initial two weeks' worth of newspaper strips were not created at the instance of either Detective Comics or McClure; instead, a wholly different "motivating factor" instanced their creation by Siegel and Shuster during the spring of 1938.

The sequence of events surrounding these two weeks' worth of newspaper strips is telling: It began with Siegel soliciting interest in Superman for newspaper syndication in March or early April, 1938. McClure expressed some interest, telling Siegel to draft two weeks' worth of material for syndication and suggesting that the material fill in the background of Superman's origins and arrival on Earth. Siegel and Shuster created the material, focused on Superman's origin and arrival, and submitted it to McClure. McClure then *returned* the material to Siegel pending its decision whether it wished to proceed with syndication efforts. In the meantime, Sie-

gel submitted the material to *other* newspaper syndicators for their consideration. Eventually, McClure, not any other newspaper syndicator, entered into a syndication agreement with Detective Comics and the artists.[22]

It is clear to the Court that the initial two weeks' worth of newspaper material Siegel and Shuster created in the spring of 1938, well *before* the syndication agreement, was not made at the instance or expense of anyone but the artists. Admittedly, McClure did ask for the material to be created and did make suggestions as to its subject matter, but such requests were done outside the confines of any business relationship between the parties and, more importantly, other circumstances rebut the importance of this fact. Moreover, the work was created without any discussion of, much less any guarantee of, compensation and without any commitment from McClure that it would ever publish the material.

Defendants place great weight on the fact that the two weeks' worth of newspaper strips were derivative in nature, arguing that such status forecloses the work's creation from being done in the instance of anyone but the owner of the underlying material—Detective Comics. However, the cases defendants cite to for this proposition, as noted by the Court in its prior order in the Superboy matter, require that the rights holder to the underlying material actually be the one that sought out and engaged the artists to create the derivative work beforehand. *See Siegel*, 496

F.Supp.2d at 1142–44. Here, creation of the first two weeks' worth of newspaper strips were not commissioned by Detective Comics, but, at most, were commissioned by McClure, who *at the time* held no rights to the underlying Superman copyright.

Following up on that point, defendants next seek to label Siegel's interaction with McClure as little more than "an inchoate solicitation requesting an opportunity to perform a work," which it is argued is insufficient to support a finding that the matter was done at the instance of the artists. For this proposition, defendants rely on the district court's opinion in *Burroughs*. In that case, the noted illustrator Burner Hogarth approached the owner of the copyright in the character Tarzan, Edgar Rice Burroughs, Inc. ("ERB"), suggesting that the company "take up the illustration of the Tarzan Sunday Color Page," which could be reproduced in "hard cover book." ERB later replied that the company's comic book properties were in flux and that the two would have to "suspend our discussions temporarily." Undeterred, Hogarth wrote back six months later, noting his availability to create the Tarzan artwork. At that point, ERB wrote a series of letters (dated in July, 1970) inquiring whether Hogarth could produce "a quality, high priced edition of an adult version Tarzan of the Apes in graphic form," "described in detail" what it envisioned the book to be, and "proposed terms for the project" (including compensation) that ultimately found their way into the parties' written agreement. *Id.* at

---

**22.** Both sides make attempts at historical revisionism of this record. However, viewed in light of this record, plaintiffs' contention that Siegel had written the script for the two weeks of material "on his own volition," before soliciting McClure's interest is unsupported. (Pls.' Obj. Defs.' Reply at 13). Siegel's own recounting of how and when the material was created contradicts this contention. Defendants' characterization of the facts fares no better. They assert that Siegel's solicitations for Superman's appearance in newspaper strips was at Detective Comics' direction or, at least, with Detective Comics' approval. (Defs.' Obj. to Pls.' July 28, 2008 Opp. at 8). The evidence clearly shows that Siegel first approached McClure, then *later* sought to bring Detective Comics into the fold *after* receiving a positive response from McClure.

1303–04. Thereafter, Hogarth set about creating the work requested.

With this factual backdrop, the district court concluded that Hogarth's early contacts with ERB were not sufficient to demonstrate the book was made at his instance, commenting "not every solicitation requesting an opportunity to perform work constitutes an instancing." *Id.* at 1316. Instead, the district court found the book project was "first 'instanced' by [ERB] in [its July, 1970] . . . letters, which predicted all of the principal terms for production of the . . . Books." *Id.* The district court further found significant the fact that because Hogarth was dealing directly with the owner of the underlying Tarzan material of which the book solicited would be derivative: "[I]t would be 'beyond cavil that [he] would . . . have undertaken production of artwork for the Books [or] brought [it] to publication, without receiving the assignment from ERB to do so.'" *Id.* at 1317.

In contrast, here, the uncontroverted evidence shows that Siegel and Shuster did just that: Siegel created the script and Shuster created the artwork for the first two weeks of newspaper strips without any indication that they received permission to do so beforehand from Detective Comics. Admittedly, both Siegel and McClure understood such permission from Detective Comics would ultimately have to be forthcoming before the material could be published,[23] but that is a far cry from the notion that Detective Comics engaged Siegel and Shuster to create the material at its instance. To the contrary, the clearly defined (and expressed) understanding that an artist must *eventually* obtain from a copyright holder approval of his or her actions in creating a derivative work before that work may be *published* is funda-mentally different that the notion that the copyright holder tasked that artist with *creating* the derivative work in the first instance. Unlike the artist in *Burroughs,* Siegel did not solicit from the underlying rights holder an opportunity to create a derivative work; he instead solicited a third party who at the time held no rights.

Nor does the fact that Siegel and Shuster were engaged by Detective Comics for creating Superman material necessarily lead to the conclusion that the newspaper strips were done at Detective Comics' instance. Such material did not fall within the scope of what Detective Comics had (at the time) commissioned them to produce—comic *books.* This fact was reinforced by Detective Comics letter *after* the execution of the syndication agreement that it did not view creation of the newspaper material as giving it "little to gain in a monetary sense" and by Siegel and Shuster's later testimony during the 1947 Westchester litigation that the impetus to seeking such newspaper syndication material after the March 1, 1938, grant was precisely because Detective Comics was *not* in the business of syndicating newspaper comic strips.

Nor ultimately does the Court conclude that the material was prepared at McClure's instance. The fact that the material was created only after Siegel approached McClure and McClure suggested a specific subject for the material (Superman's origin and arrival on Earth) would normally lead to the conclusion that the work was done at McClure's instance. *See* 2 PATRY ON COPYRIGHT § 5:74 ("whether the hiring party is the motivating factor for the creation of the work, a very important, and usually determinative factor is whether the work was substantially completed at the time it was allegedly specially or-

---

23. This is evidenced by McClure's admonition in its correspondence with Siegel that he "should get a letter from [Detective Comics] before [the parties could] get down to brass tacks on SUPERMAN."

dered.... If the work has not been begun before the parties meet, this fact weighs in the hiring party's favor"). That McClure did not involve itself in supervising the creation of the artists' work is likewise unimportant. *Id.* ("the 'status of a work created by an independent contractor as a specially ordered ... work made for hire has nothing to do with whether the commissioning party exercise any ... supervision and control over the independent contractor's work.' Instead, it is sufficient that the hiring party request a specific type of work without having to be involved in the details of its creation"). There is, however, one complicating wrinkle that distinguishes this case from all the other cases where a work is made by request as a condition for obtaining employment— when presented with the works reflecting the suggested storyline, McClure promptly returned it, commenting that it would defer making a decision on the matter.

On this point, the Court finds the events that occurred after the materials' return of greater significance: Siegel and Shuster attempted to sell this same two weeks' worth of newspaper strips to another syndicator (The Register and Tribune Syndicate), a fact which they publicized to Detective Comics and McClure without objection from either. If the material was intended by the parties to be a work made for hire owned by McClure, such an act would be completely contrary to such ownership. That the artists nonetheless openly engaged in such efforts to sell the work to others weighs heavily against creation of that material being treated as a work for hire. *See Martha Graham Sch.,* 380 F.3d at 638 (finding significant in conclusion that works (choreographed dances) were not made for hire the fact that even after employing the artist to teach she "continued to receive income from other organizations for her dance teaching and choreography").

Furthermore, the comment in the correspondence from the other syndicator—that "[a]ny action on our part should not conflict with your progress in dealing with the McClure Syndicate[; i]f they are in a position to take on your strip, naturally I presume you will want to go ahead"— gives the impression that ownership in the material was still, at that time, up for bid, with McClure, at most, operating under the auspices of an informal right of first refusal and not under the assumption that the rights belonged to any particular syndicator from its inception. Such a "right of first refusal ... is fundamentally incompatible with a finding that a work ... is ... made for hire." *Siegel,* 496 F.Supp.2d at 1141. *Cf.* 1 NIMMER ON COPYRIGHT § 5.03[B][2][D] at 5–56.8 ("[A] commission relationship may not exist, even if the work is prepared at the request of another, and even if such other person bears the costs of its creation, where the person requesting the work is expressly granted only a one-time use").

This leads to the next significant factor: That the creation of the material occurred without any mention or provision for compensation (either a fixed sum or a percentage royalty) for the artists. Even after creating the material, Siegel and Shuster's efforts went unpaid for at least five months. This distinguishes the present case from *Burroughs* where the commissioning party's suggestion for the creation of the work contained within it a recital of the basic financial terms of the engagement. Simply stated, there is no evidence that the material in question was made at the expense of anyone save for the artists that created the material, and who in turn shopped it to multiple syndicators looking for any takers to its publication.

Accordingly, the Court finds that the two weeks' worth of newspaper comic strip material created by Siegel and Shuster

during the spring of 1938, *before* the execution of the syndication agreement were *not* works made for hire.

## IV. ASSIGNMENT OF THE FIRST TWO WEEKS' WORTH OF NEWSPAPER STRIPS AND TERMINATION NOTICE DEFICIENCIES

As with all the Court's findings regarding work-for-hire status, this conclusion has certain legal ramifications that necessarily flow from it which raise secondary legal arguments concerning the plaintiffs' ability to terminate the grant of these two weeks' worth of newspaper strips. Thus the Court must address whether all of the rights to the first two weeks' worth of newspapers strips were assigned, the failure to serve McClure with the termination notice, and the failure to identify the first two weeks' worth of newspaper strips among the works subject to termination in the notice.

### A. *Assignment of the First Two Weeks' Worth of Newspaper Strips*

■ Because the initial two weeks' worth of newspaper strips were not works made for hire, when those strips were created, the copyright in them belonged at its inception to Siegel and Shuster. That copyright was protected under state common law until the works were published in January, 1939, at which time federal statutory copyright protection may have attached, depending upon compliance with certain statutory formalities. *See Siegel v. Time Warner Inc.*, 496 F.Supp.2d 1111, 1130 n. 7 (C.D.Cal.2007). As Professor Nimmer explains in his treatise: "As to a work created and the subject of statutory copyright prior to [the 1976 Act], such copyright did not subsist from the moment of creation. Rather, it became effective either upon publication with notice. . . . Prior to such publication . . ., a work created before [the 1976 Act] was protected from its creation under the state law of

common law copyright. Common law copyright in a work initially vested in the author or authors thereof." 1 NIMMER ON COPYRIGHT § 5.01[B] at 5–6. Because the Court has found that the two weeks' worth of newspaper strips are not works made for hire, the "author" of those strips would be Siegel and Shuster, not Detective Comics or McClure. This designation is important because it impacts who may claim ownership of the works when published, the required contents of the copyright notice affixed to the works when published, and the contents of the registration certificate that was issued.

The 1976 termination provisions are limited only to grants in federally copyrighted works, meaning works subsisting in a statutory initial or extended renewal term as of the 1976 Act's effective date. The right to terminate does not apply to unregistered copyrights protected at common law or copyrights to works that have fallen into the public domain as of the time of the 1976 Act. *See* PATRY ON COPYRIGHT § 7:42. Thus, for the termination notice to be effective to reclaim the rights to the newspaper strips, the newspaper strips must have obtained proper federal statutory copyright protection and maintained that protection up through the time of the 1976 Act. This then raises the question of whether and how Siegel and Shuster did obtain such statutory copyright protection of the material in their newspaper strips under the 1909 Act; any defect in the process would call into question plaintiffs' ability to terminate the grant to the copyright in those works. Again as Professor Nimmer explains:

> However, the subsequently obtained statutory copyright [upon publication with notice] vested in such author or authors only if prior thereto, there had not been a transfer of the common law copyright. . . . In the event of such disposition, it was the transferee and not

the original author or authors in whom statutory copyright initially vested. The determination of the proper person initially to claim statutory copyright under the 1909 Act remains of more than antiquarian interest, as an improper claim under the 1909 Act could have injected a published work into the public domain. 1 NIMMER ON COPYRIGHT § 5.01[B] at 5-6.

The question of assignment is highly significant because, under the 1909 Act, agents and licensees could not claim such statutory copyright ownership, but an assignee could. "The assignee of an author's common law copyright might, by virtue of such assignment, claim statutory copyright." *Id.* at 5-7.

The pertinent facts are reiterated for purposes of this discussion: The first two weeks of newspaper strips were first published on January 16, 1939, in the *Milwaukee News Journal,* which contain the following notice affixed thereto "Copyright, 1939". The initial copyright registration is treated as having been registered in the name of McClure Newspaper Syndicate, listing as the works authors "Jerry Siegel and Joe Shuster, of United States" [24] Later on July 3, 1944, McClure "assigned to Detective Comics, Inc. all its rights, title and interest in all copyrights in SUPERMAN, including the copyrights and all renewals and extensions thereof." [25]

As the facts are presented in this case, an assignment by Siegel and Shuster to McClure must have occurred before publication of the initial two weeks' worth of newspaper strips; otherwise, the copyright notice on the works when first published was inadequate to comply with the statutory formalities, and the works have fallen into the public domain. (Defs.' Obj. and Response New Arguments at 2 (assuming "Siegel and Shuster owned the copyright of these works from inception, there would need to have been an assignment from them of their entire copyright rights to McClure before the strips appeared, in order to avoid loss of copyright")).

Plaintiffs argue that the parties' course of conduct in conjunction with various terms in the syndication agreement itself clearly imply that such an assignment of the artists' rights in the newspaper strips to McClure occurred. As explained by plaintiffs:

While there is no express mention of a sale or transfer, under the [syndication] agreement Siegel and Shuster delivered the newspaper strips, protected by common law copyright, to McClure. McClure then copyrighted the material

---

**24.** Defendants state that the copyright notice under which the material was first published was "in the name of McClure," (Defs.' Obj. to New Arguments at Hearing at 1), but as noted by the Court, the notice affixed thereto actually did not list McClure, or anyone, as the copyright proprietor. Such a designation in the notice was required by § 19 under the 1909 Act, but this defect is of no consequence as the Second Circuit's decision in *Fawcett* held that such a defect in the notice was saved by virtue of § 21 except in those instances in which McClure "sent out 'mats' [of the strips to newspapers] without any notice at all"; in such a situation "the copyrights on those 'strips' were lost, regardless of § 21." 191 F.2d at 601.

**25.** Two years after this assignment from McClure, Detective Comics was consolidated into other companies into a company called National Comics Publications, Inc., which in turn was later consolidated in 1961 into the aforementioned National Periodical Publications, Inc. In the 1961 consolidation agreement it was represented that the new company had become "vested with all the properties of Detective Comics, Inc., and National Comics Publications, Inc.," including that it was "the owner of and is vested with title to all of the copyrights (and renewals and extensions thereof) in the artistic and literary works consisting of newspaper cartoon strips or continuities entitled SUPERMAN which the McClure Newspaper Syndicate had from the first day of publication to July 3, 1944."

in its own name [ (which the syndication agreement clearly provided was permissible for them to do) ], listing Siegel and Shuster as the 'authors.' McClure then granted an exclusive license to Detective with respect to the non-syndication rights [ (namely, allowing Detective Comics to use the strips in its comic book magazines free of charge six months after the strips first publication in the newspapers) ], and later on July 3, 1944 assigned the entire copyright [in the newspaper strips] to Detective per the term of the [syndication] agreement. (Pls.' Opp. and Response to Defs.' Sur-reply at 11)

Defendants respond by arguing that an assignment must be supported by a clear, unambiguous, written instrument, and that such instrument is lacking here. (Defs.' Obj. and Response to New Arguments at 2–3 & n. 5) ("there is no question that neither of the September 22, 1938 agreements include such an assignment ... There is no language of copyright assignment" and further commenting that "any assignment of common law copyright would have to have been in writing under the statute of frauds"). This argument does not withstand scrutiny.

At the outset, the Court notes that an assignment of a common law copyright was not subject to a requirement of writing. To the contrary, during the time the 1909 Act was in effect, at common law, a copyright was capable of assignment so as to completely divest the author of his rights, "without the necessity of observing any formalities." *Urantia Foundation v. Maaherra,* 114 F.3d 955, 960 (9th Cir. 1997); *accord Epoch Producing Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 747 (2d Cir.1975) (noting that assignment need not be in writing); 3 NIMMER ON COPYRIGHT § 10.03[B][2] at 10–56.3 ("it appears that an assignment of common law copyright was not within the Statute of Frauds").

Other case law further demonstrates that such an assignment could be oral or could be implied from the parties' conduct. *See Jerry Vogel Music Co. v. Warner Bros., Inc.,* 535 F.Supp. 172 (S.D.N.Y.1982); *Van Cleef & Arpels, Inc. v. Schechter,* 308 F.Supp. 674 (S.D.N.Y.1969).

Having rejected the notion that any writing is required, the Court nevertheless concludes that the parties' syndication and employment agreements, as well as their actions, make clear that the requisite complete assignment of both the initial and the renewal term occurred.

Although the words "assign" or "transfer" do not appear in the syndication agreement, such an intent was demonstrated by other language contained in the agreement, as well as by Siegel and Shuster's delivery of the newspaper strip material to McClure. The syndication agreement provided that McClure would hold "all the original drawings of the 'Superman' strip," which it would later provide to Detective Comics on license for publication in its comic books. Such expressed receipt of the "original" material in question and the ability to license that material is not the language used to describe the recipient of a mere license to the material in question, but as one of an assignee. As Judge Hand remarked, "[t]hat is the language of a 'proprietor,' who assumes power to license another copy the 'works.'" *Fawcett,* 191 F.2d at 599; *see also Urantia,* 114 F.3d at 960 (noting that language in trust instrument declaring that transferee "retain[ed] absolute and unconditional control of all plates ... for the printing and reproduction ... thereof" was indicative of an "intent to transfer the common law copyright").

Defendants also argue that there could have been no assignment to the two weeks' worth of newspaper strips through the syndication agreement because that agree-

ment indicated that at the time of the document's execution Siegel and Shuster "had already created 'the sample submitted' and that the subject 'daily strip' . . . entitled 'Superman' . . . was owned by Detective." (Defs.' Obj. and Response to New Arguments at 3). This argument selectively pieces together different portions of the agreement as if they were written as a single whole, when in fact those sections, read in the context, clearly indicate that the parties were not speaking specifically to the initial two weeks of newspaper strips. Rather, they were speaking more generally to all newspaper strips published pursuant to the agreement. Similarly, the reference defendants make to the agreement noting Detective Comics' ownership to the title "Superman" does not necessarily apply to the strips themselves, a distinction which Judge Hand also drew when construing these same agreements.

Moreover, Siegel and Shuster not only allowed McClure to syndicate the Superman newspaper strips, they gave McClure the original manuscript and artwork to the same to McClure to hold in its possession. "It has been held that delivery of a manuscript suffices" for the purpose of establishing an assignment—"so long as the intent to pass title in the common law copyright is likewise present." NIMMER ON COPYRIGHT § 10.03[B][2] at 10.56.3. Such an inference is particularly apt when "over a long period of time, the author and other interested parties had acquiesced in the putative assignee's ownership." *Urantia,* 114 F.3d at 960. Here, not only did the parties acquiesce in the agreement to McClure receiving the originals to the strips but the parties' agreement stated that the copyright notice in said material was to be made in McClure's name, something which under the 1909 Act could not be undertaken by a mere licensee but only "the author or proprietor" of the work. Sanctioning such conduct clearly consti-

tutes an acquiescence on Siegel and Shuster's part to McClure's ownership in the copyright to these newspaper strips, and is perhaps the clearest evidence in the syndication agreement itself to an assignment being made in favor of McClure by the artists.

Such language in the syndication agreement, and such action by the parties clearly demonstrate at minimum an intent to transfer the initial copyright term in the newspaper strips to McClure, *see Urantia,* 114 F.3d at 960, but there is other language in the parties' September 1938 agreements that demonstrate an intent by the authors to transfer the renewal term to those strips as well.

Not surprisingly, defendants contend that there was no such language of complete assignment from Siegel and Shuster in the newspaper syndication or employment agreements. However, when one surveys the agreements as a whole, it becomes readily apparent that there is language of assignment not just of the authors' rights to the initial term, but also (as held by and argued to the Second Circuit during the litigation surrounding the rights to the Superman renewal term in the 1970s) the renewal term as well. Notably, the one paragraph in the employment agreement that makes reference to and separately identifies the artists' creation of both newspaper strips and comic books also contained language whereby the artists agreed that they were "furnishing" this global category of material "exclusively" to Detective Comics or to whomever else Detective Comics might designate, an obvious reference to McClure. (*See* Decl. Toberoff, Ex. P ("[Y]ou shall furnish such matter exclusively to us . . . as such may be required by us or as designated by us in writing.")).

Likewise, the concluding sentence to the paragraph in the employment agreement

which spells out the royalty payment terms for the newspaper strip material created by the artists, contains an acknowledgment by the artists that "all [such] material, art and copy shall be owned by" Detective Comics or whomever Detective Comics permits (undoubtedly a reference to the derivative nature of the work) the title in the same to be "copyrighted or registered in our name or in the names of the parties designated by us" (another clear reference to McClure).

Despite this language, defendants argue that it is not sufficient, as "there is no question that *neither* of the September 22, 1938 agreements include such an assignment. The agreements speak for themselves—they are not assignments from Siegel and Shuster to anyone." (Defs.' Obj. and Response to New Arguments Made at Hearing at 3 (emphasis added)). However, defendants' position is completely contrary to that which its predecessors in interest have taken in the seven decades since those agreements were executed. It has been the position of defendants and its predecessors in interest (made manifest during the 1970s litigation surrounding the rights to the Superman renewal term) that the March 1, 1938, grant as well as the other agreements the parties entered into (up to and including the 1948 stipulated judgment concluding the Westchester action), that the artists in each instance effectuated a complete assignment of both the initial and renewal terms to the Superman character.

■ Under the 1909 Act, general words of assignment can include renewal rights if the parties had so intended. *See Venus Music Corp. v. Mills Music, Inc.,* 261 F.2d 577 (2d Cir.1958); *cf. Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 653, 63 S.Ct. 773, 87 L.Ed. 1055 (1943) (observing that a specific intent to transfer the renewal term must be present). Following this line of authority, the Second Circuit in the 1970s Superman litigation held that evidence of the parties' conduct and iterations of their various contractual arrangements, which included language acknowledging that the publisher would hold title to the copyright in the character "forever" and prohibiting the artists' from exploiting Superman "at any time hereafter" except with the character's publisher, indicated not simply an assignment of the artists' initial term in the Superman character, but the renewal term as well. *Siegel,* 508 F.2d at 913–914 (stating that "[t]he ready answer to this argument is that the state court action determined that the agreements conveyed all of the plaintiffs' rights in Superman to the defendants and not just the original copyright term" and noting that the presence of such general terms of conveyance in the parties' agreements such as "hold[ing] forever" a given right and agreeing not to use Superman in any other strip "hereafter" connoted an assignment to the entirety of the copyright in that material (emphasis added)).

■ This is the same language contained in the employment agreement ("owned by us" or McClure, "will not hereafter" exploit Superman character except with either Detective Comics or McClure, and shall provide such material "exclusively to us" or McClure), whose terms also apply, in this context at least, to the syndication agreement. Defendants, having relied on that judgment for over thirty years to exploit Superman to the exclusion of any rights held by the artists, cannot at this late date be heard to complain that a court will likewise rely on that judgment as a basis to permit those artists to reclaim, under the statutorily provided termination scheme, the rights transferred in those much-hailed grants. Defendants are thus precluded both as a matter of judicial estoppel and as a matter of res judicata

from contesting whether there was "language of [complete] copyright assignment" to both the initial and renewal term to the Superman material at issue in the employment and newspaper syndication agreements.

Thus, the Court rejects the notion that the initial two weeks' worth of newspaper strips is not subject to termination on account of the lack of any assignment by Siegel and Shuster to the entire copyright in that material to McClure prior to the material's publication.

### B. *Failure to Serve McClure with Termination Notice*

 Defendants contend that, if there was such an assignment from Siegel and Shuster to McClure, plaintiffs' failure to serve a copy of the termination notice on McClure's successors renders the termination notice invalid. (Defs.' Obj. and Response to New Arguments at 3 n. 6). Because all of McClure's rights in the material were assigned to Detective Comics in 1944, and Detective Comics' successors were served with the termination notice, the Court rejects this argument.

The 1976 Copyright Act provides that the termination notice must be served upon the "grantee or the grantee's successor in title." 17 U.S.C. § 304(c)(4). Moreover, the regulations provide that an investigation will satisfy this notice requirement in the context of termination of rights to works created before the effective date of the 1976 Act. 37 C.F.R. § 201.10(d)(2) states that section 304(c)(4)'s service requirement is met if there has been a "reasonable investigation" as to the current ownership of the rights to be terminated and service has occurred on the person or entity "whom there is reason to believe" is the current owner by transfer from the grantee.

Soon after the 1976 Act became effective, courts were faced with the question of whether this provision, stated in the disjunctive, meant that a notice served upon the immediate grantee would suffice, so that such grantee's current successor in title need not be notified of the termination of its rights; the reverse situation from that found in the present case.

In *Burroughs v. Metro–Goldwyn–Mayer, Inc.,* 683 F.2d 610, 633 (2d Cir.1982), the district court held that failure to serve the current successor in title rendered ineffective a purported termination, notwithstanding service on the original grantee. On appeal, although the Second Circuit found it unnecessary to decide that particular issue, Judge Newman addressed it in a thoughtful concurring opinion. Acknowledging that it was "not clear from the statute or the regulations who [as between the 'grantee' and 'the grantee's successor in title'] must receive notice of termination, and the legislative history offer[ed] no guidance," *id.,* Judge Newman construed the statutory provision as "sensibly read to mean that notice is to be served (a) on the grantee, if the grantee has retained all rights originally conveyed, (b) on the transferee, if the grantee has conveyed all rights to the transferee, or (c) if some rights have been conveyed, on the grantee or the transferee (or both) depending upon which rights are sought to be terminated." *Id.* at 634 n. 5. In Judge Newman's view, the statute was written to require service on only those entities that currently hold a right to be terminated; it was not meant to require a mad dash to serve everyone and anyone who may have been involved in the chain of title to the copyright (but who possess no present right to the same), as suggested here by defendants. "Whatever the meaning of 'grantee' and 'successor in title' in the notice termination provision, it seems evident that their expression in the disjunctive was intended to cover various contingencies, not to afford those exercis-

ing termination rights a choice as to whom to serve." *Id.*

As explained by Professor Nimmer, "It follows that if the grantee has transferred some but not all of the rights that he acquired under the grant, whether the original grantee, his successor with respect to some of the rights, or both, must be served will turn on which rights are purportedly terminated under the termination notice. If all rights are being terminated, all of the persons who own any portion of such rights must be served in order to effectuate the termination, as the district court concluded." 3 NIMMER ON COPYRIGHT § 11.06[B] at 11–40.20.

■ The Court finds Judge Newman's concurring opinion in *Burroughs* to be persuasive, and adopts the reasoning con-

tained therein. As summarized by Professor Nimmer, "[i]t follows, then, that service of the termination notice need only be made upon the last grantee in the chain of title of which those serving the notice are reasonably aware." 3 NIMMER ON COPYRIGHT § 11.06[B] at 11–40.18–11–40.21.

This is exactly what occurred here. Plaintiffs served the notice on the newspaper strips' most current owner—Detective Comics' successors in interest, DC Comics. Defendants try to diminish the significance of the 1944 assignment from McClure to Detective Comics of all its (McClure's) rights in the newspaper strips as nothing but a meaningless gesture.[26] But if Siegel and Shuster had, in fact, assigned their copyright in the newspaper strips to McClure, then the transfer would be deeply meaningful as it is a clear and unambig-

---

**26.** The argument is built largely on the assumption that Detective Comics never received the ownership to the renewal term copyright by way of a "grant of a transfer or license" from McClure. 17 U.S.C. § 304(c). Such an argument seeks to make much of the fact that the first proviso to section 24 of the 1909 Act, provided that the right of renewal for a "periodical" work is given to "the proprietor of such copyright." Barbara A. Ringer, *Study No. 31 Renewal of Copyright* (1960), *reprinted in* 1 Studies on Copyright at 524. As explained by Ringer, "the 'proprietor' in this context means the owner of the copyright at the time renewal registration is made, and not the first or original proprietor. In other words, a 'proprietor' claim [to the renewal right] follows the ownership of the copyright, and is not a personal right like the claim of an author under the second proviso." *Id.* Thus, when McClure secured the original copyright for the newspaper strips, it was the first proprietor and therefore entitled thereto to the renewal copyright in the same. Defendants argue that when ownership was transferred in this copyright from McClure to Detective Comics, that the renewal term, rather than being transferred by agreement, was transferred by way of an automatic function of the statute. (Defs.' Obj. to New Arguments at Hearing at 2 n. 4). This distinction, however, is mistaken.

The second proviso to section 24 noted that "in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic work or other composite work, the author of such work" was entitled to the renewal term. Judge Learned Hand later defined the term, "composite work," for purposes of the first proviso in section 24, as limited to works "to which a number of authors have contributed distinguishable parts, which they have not, however, 'separately registered.'" *Shapiro*, 123 F.2d at 699. Here, however, the newspaper strips were separately registered in the name of their individual authors after the publication of the composite work in question, the newspaper. Indeed, the two weeks' worth of newspaper strips themselves bear a separate copyright notice on them. In such an instance, the author of the work was entitled to the renewal in the separately registered copyright, and hence, Detective Comics' receipt by way of assignment from McClure to said renewal term was not effectuated automatically by way of statute. *See Self–Realization Fellowship v. Ananda Church*, 206 F.3d 1322, 1329 (9th Cir.2000) (holding that proprietor entitled to renewal term in composite work unless the individual contribution was separately registered).

uous grant of both the initial and the not-yet-vested renewal term to the copyright in those strips, thereby rendering Detective Comics (as its immediate successor National Periodical Publications, Inc., would proclaim a few years afterwards) sole owner of the entirety in the copyright to those newspaper strips owing entirely to McClure's later assignment. Indeed, defense counsel conceded during oral argument that if McClure held the copyright to the newspaper strips in trust for Detective Comics, then it would have required a "reassignment" for the copyright to be transferred to Detective Comics. Given that Judge Hand held that the right in the material was indeed held "in trust" for Detective Comics, such an assignment was anything but a meaningless gesture.

No party disputes that the termination notice was served on DC Comics, the successor to Detective Comics and current holder of all the copyright in the newspaper strips. Accordingly, the termination notice complied with section 304(c)(4), and is not defective based on plaintiffs' failure to serve McClure.

## C. *Failure to Include Strips in Notice as Works Affected by Termination*

 Having found that the initial two weeks' worth of newspaper strips created in the spring of 1938 were not works made for hire, having concluded that Siegel and Shuster assigned all their rights in the copyright to those two weeks' worth of strips to McClure (which later assigned all its corresponding statutorily protected copyright to Detective Comics), and having determined that plaintiffs' failure to serve McClure or its successor does not invalidate the termination notice as to these newspaper strips, the Court is confronted with one final question: Whether the failure to list in the termination notice the initial two weeks' worth of newspaper strips, first published in the *Milwaukee News Journal* in January, 1939, invalidates

the termination notice as to these newspaper strips. (Decl. Michael Bergman Summ. J. Mot., Ex. X at 325 (complete termination notice reprinted)). In the end, the Court determines it does not.

A fact not lost on either party or the Court is that potentially valuable copyright elements subsist in this material, as it is the first material in which Superman's home planet of Krypton is named, Superman's Krypton name is revealed, and the circumstances surrounding Krypton's destruction are revealed. Plaintiffs, to their credit, candidly admit that the first two weeks' worth of newspaper strips are not listed in the termination notice; but they point to the fact that the notice did contain the following catch-all clause:

> This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, ... the planet Krypton.... Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

(Decl. Bergman, Ex. X at 3 n. 1).

Defendants, for their part, advocate a harsh rule: A mistake, even one of omission, is a mistake of consequence; where such a mistake is made, the authors and their heirs must suffer whatever consequences that flow from the resulting invalidity of the copyright notice. The Court cannot countenance such a harsh, per se rule that is divorced from the underlying facts.

Although there is no approved form for termination notices, the Copyright Office has promulgated regulations specifying the required contents of a termination notice: It must contain a "complete and unambiguous statement of facts ... without incorporation by reference of information in other documents or records," 37 C.F.R. § 201.10(b)(2), and it must include the following:

1. the name of each grantee whose rights are being terminated or the grantee's successor in title, and each address at which service is made;

2. the title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice applies (including, if available, the copyright registration number);

3. a brief statement reasonably identifying the grant being terminated;

4. the effective date of the termination; and

5. the name, actual signature, and address of the person executing the termination.

37 C.F.R. §§ 201.10(b)(1)-(2), (c)(1), and (c)(4). The regulations promulgated by the Register of Copyrights also contain a safety valve that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of [the statute] shall not render the notice invalid." 37 C.F.R. § 201.10(e)(1).

In support of their position, defendants rely on *Burroughs v. Metro–Goldwyn–Mayer, Inc.*, 683 F.2d 610 (2d Cir.1982). In that case, the author's heirs attempted to terminate the grant to the copyright in all the books written by Edgar Rice Burroughs featuring the character Tarzan. In the termination notice, however, the author's heirs mistakenly listed only 30 of the 35 Tarzan books written by Burroughs. In considering whether the ter-

mination notice was effective in recapturing the copyright in those five omitted books, the Second Circuit held that the omission, although inadvertent, rendered the termination notice invalid as to those omitted works. *Id.* at 622 (noting that "the omission of the five titles" left the grant "in those five books ... intact" and unaffected by the termination notice). In reaching this conclusion, the Second Circuit did not discuss section 210.10(a)(1)'s harmless error provision; rather, the court simply noted that the regulations required identification of the title and date of original copyright for each work sought to be recaptured, observed the omission in the termination notice, and held that therefore the termination notice was invalid as to the omitted works.

Defendants thus vastly overstate the holding of *Burroughs* as supporting the proposition that plaintiffs' "failure to identify [the newspaper strips] is fatal to their purported termination *and their omission cannot be mere 'harmless error.'*" (Defs.' Obj. to New Argument at Hearing at 7 (emphasis added)). Its failure to discuss the harmless error rule makes *Burroughs* of limited persuasive value to the Court's current analysis.

On this point, the Court has discovered only one court decision that considered whether omissions or defects in the termination notice were "harmless errors" such that the termination notice was effective. *See Music Sales Corp. v. Morris*, 73 F.Supp.2d 364 (S.D.N.Y.1999). There, the termination notice consisted merely of a bland boilerplate statement: "Grant or transfer of copyright and the rights of copyright proprietor, including publication and recording right." Although finding that the generic statement would not "reasonably identify[ ] the grant," the district court nonetheless upheld its adequacy on the basis that "it appears to be boilerplate

on termination notices customarily accepted by the Register of Copyrights." *Id.* at 378.

Leading commentators have differing views on *Music Sales Corp.*, and by extension, differing views on how stringent courts should be in applying the harmless error safety valve. Professor Nimmer, on one hand, is much more formalistic on this point, cautious of the proverbial slippery slope. As Professor Nimmer explained in response to the *Music Sales* decision:

> [T]he Register of Copyrights does not pass judgment by accepting notices of termination, so that the ministerial act of filing them connotes no approval of their verbiage. On that basis, the court's citation to authority allowing agencies to interpret statutory requirements is inapposite. But the court also cites unspecified custom of the industry as validating the boilerplate approach. It remains to test what that custom might be.

3 NIMMER ON COPYRIGHT § 11.06[B] at 11–40.22–11.40.22(1).

Patry, on the other hand, praised the *Music Sales* decision as bringing the formalities contained in the regulations into conformity with the realities of how those regulations are actually administered by the agency that was charged with crafting them. *See* 3 PATRY ON COPYRIGHT § 7:45 ("In *Music Sales Corp. v. Morris*, the requirement of a 'brief statement reasonably identifying the grant to which the terminated grant applies' was reviewed, with the court wisely accepting industry custom and Copyright Office practices as indicating compliance").

The dearth of case law, along with the divergence of opinion between these two leading commentators, presents the Court with an apparent choice: On the one hand, the Nimmer approach, *i.e.*, an insistence on rigid adherence to the formalities specified in the regulations or, on the other hand, the less formalistic (but more practical), lax approach set forth in *Music Sales* and endorsed by Patry, i.e., acceptance of industry and agency custom. The Court declines to choose one extreme or the other, applying instead a middle path that requires a more fact-intensive inquiry in applying the harmless error safety valve.

Here, it is clear to the Court that plaintiffs undertook enormous effort to comply with the overly formalist requirements of the termination provisions, literally providing 546 pages' worth of works subject to the termination notice. The purpose of the regulations is to give the recipient of the termination notice sufficient information to understand what rights of theirs may or may not be at stake. Here, any recipient of the termination notice would quickly understand that the plaintiffs have sought to reclaim the copyright in any and all Superman works ever created. Indeed, any publisher receiving the notice would be foolish to believe otherwise. That the termination notice included a broad and comprehensive catch-all clause only reinforces that which the 546–page listing of titles of works subject to the notice makes painfully obvious.

This reasoning is all the more sound because what was sought to be recaptured involved the rights to works involving a particular character that has been continuously exploited for decades. It is this peculiar nature of the subject matter of the termination notice that makes rigid adherence to the regulatory formalities particularly inapt:

> In the case of works consisting of a series or containing characters requiring the terminating party to list separately each work in the series or all works in which the character appears would render the termination right meaningless. Instead, notice that reasonably puts the

terminated party on notice of the character being terminated is sufficient.

3 Patry on Copyright § 7:45. There is little doubt that plaintiffs' termination notice satisfies this concept of reasonable notice that the copyright in the entire body of works to the Superman character was sought to be recaptured.

The commentary accompanying adoption of the regulation buttresses this view that such a reasonable notice test is particularly apt with respect to copyrights in characters appearing in thousands of works in countless media over many decades. In that commentary, the Register of Copyrights (Barbara Ringer), observed that the Copyright Office "remained convinced that the required contents of the notice must not become unduly burdensome to grantors, authors, or their successors, and must recognize that entirely legitimate reasons may exist for gaps in their knowledge and certainty." *Termination of Transfers and Licenses Covering Extended Renewal Term,* 42 Fed.Reg. 45916, 45918 (Sept. 13, 1977).

Such a conclusion does not necessarily conflict with the Second Circuit's decision in *Burroughs*. There was a plausible evidentiary basis upon which the court in *Burroughs* could have reached the outcome it did, even with consideration of the harmless error safety valve as articulated here. There were only thirty-five Tarzan books that were possibly subject to termination. In such a case, with a more finite universe of works possibly at issue, the omission of a few of those works in the termination notice would comprise a significant level of exclusion (roughly 15%). Thus, the works' exclusion could quite legitimately be viewed as a more meaningful act by the recipient of the notice. Stated differently, in such a situation, there is simply less of a chance for a mistake or oversight occurring in identifying works in the notice, and thus more probable that

the recipient would reasonably believe the omission to be intentional, thereafter acting accordingly when contracting with other parties regarding the copyrights to the omitted works. If the terminating party later declares its intention to recapture the omitted works, it is more likely that the notice's recipient will suffer some prejudice beyond the simple reclamation of the rights to the omitted works. Such a circumstance is not present in a case where, as here, there is a universe of literally thousands of possible works.

In the end, the Court finds that some consideration must be given to the nature of the copyrights sought to be recaptured. In a case involving thousands of works, to insist on literal compliance with the termination notice regulations sets up a meaningless trap for the unwary without any meaningful vindication of the purpose underlying the regulation at issue, a result that the Register expressly disavowed as the intent of the regulations. Even the most cautious cataloguer could easily overlook a stray work or two among the many thousands at issue here. The existence of the catch-all provision, while not always necessarily dispositive, clearly and expressly evinces an attempt by the authors to recapture the rights to all the Superman works they authored, and the failure to expressly list the initial two weeks' worth of newspaper strips among those works is harmless error.

Having said that, the Court does not hold that all termination notices with similar catch-all provisions will necessarily be sufficient as to inadvertently omitted works. However, when the notice evidences a demonstrable effort at cataloguing all the relevant and related works, where the universe of those works is large (and certainly larger than the universe of thirty-five works at issue in *Burroughs* ), and where the number of omitted works is minute relative to the included works, the

presence of a comprehensive catch-all provision such as that found here leads to the conclusion that the relevant omission was harmless error and the termination notice should be found to be effective even as to the omitted works.

Here, the near-Herculean effort and diligence then-plaintiffs' counsel, Arthur J. Levine, placed on cataloging the works and drafting the termination notice, and the inclusion of the express catch-all provision in the termination notice, put to rest any reasonable doubt defendants may have had that plaintiffs sought to recapture all, not just some, of the copyright in the Superman character. In short, if receipt of the nearly six-pound, 546–page termination notice was not enough to convey this message, it was made plain by the explicit statement expressing plaintiffs' intent to terminate the copyrights in *all* the Superman works.

Accordingly, the Court finds that failure to list the two weeks' worth of newspaper strips was harmless error that does not effect the validity of the termination notice to the first two weeks' worth of Superman newspaper strips.

## V. CONCLUSION

At the conclusion of this final installment regarding the publication history of and the rights to the iconic comic book superhero Superman, the Court finds that plaintiffs have successfully recaptured (and are co-owners of) the rights to the following works: (1) *Action Comics* No. 1 (subject to the limitations set forth in the Court's previous Order); (2) *Action Comics* No. 4; (3) *Superman* No. 1, pages three through six, and (4) the initial two weeks' worth of Superman daily newspaper strips. Ownership in the remainder of the Superman material at issue that was published from 1938 to 1943 remains solely with defendants.[27]

---

**27.** Although raised by the parties, the Court declines to address, and preserves for consideration *in limine* of trial, the remaining issues raised in the parties' briefs, including the mechanics of how such an accounting would be performed (should the concept of apportionment used in the infringement context be applied and, if so, who bears the burden of proof, and whether such apportionment should be done on a work-by-work or template basis), questions on how and to what extent to divide up profits generated from so-called "mixed use" trademark/copyright, and whether and to what extent pre-termination derivative works were published *after* the termination date into post-termination derivative works subject to an accounting of profits.